UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
HECTOR CORDERO,

                Plaintiff,                     **ORDER**
                                                                                15 CV 3436 (JBW) (CLP)

            - against -

CITY OF NEW YORK, et al.,

                Defendants.
----------------------------------------------------------X

**POLLAK**, United States Magistrate Judge:

      On June 12, 2015, Hector Cordero ("plaintiff") commenced this action, pursuant to 42 U.S.C. §§ 1983 and 1988, against defendants the City of New York and John and Jane Doe 1 through 10, individually and in their official capacities, alleging violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights. On November 30, 2015, plaintiff filed an Amended Complaint, adding as defendants Lieutenant Christopher Moran ("Moran") and Police Officers Hugo Hugasian ("Hugasian"), Paul Palminteri ("Palminteri"), Raul Narea ("Narea"), John Essig ("Essig"), Lynette Reyes ("Reyes"), Peter Rubin ("Rubin"), and Marco Artale ("Artale"), and John and Jane Doe 1 through 10, individually and in their official capacities (collectively, "defendants").

      Presently before the Court is plaintiff's motion for sanctions based on alleged improper objections raised by defendants' counsel, Amatullah K. Booth, Esq. ("Booth"), during the deposition of defendant Essig on September 22, 2016.

## BACKGROUND

Plaintiff alleges that at approximately 1:00 p.m. on October 24, 2014, plaintiff was working inside of a bodega at 42 Irving Place in Brooklyn, New York. (Am. Compl.[1] ¶ 19). Plaintiff alleges that defendants entered the bodega, ordered plaintiff to go outside, and suddenly and without probable cause or reasonable suspicion to believe plaintiff had committed any crime or offense, arrested plaintiff and handcuffed him "tightly." (Id. ¶¶ 20-22). Plaintiff alleges that after being arrested, he asked "what was going on," but defendants did not respond. (Id. ¶ 23). Plaintiff claims that he was taken to the 83rd Precinct, where he was illegally strip-searched. (Id. ¶¶ 24, 25). Plaintiff claims that defendants unlawfully stopped and searched him, falsely arrested, and maliciously prosecuted him, in violation of his Fourth and Fourteenth Amendment rights. (Id. ¶¶ 32-41).

Plaintiff further alleges that, despite never witnessing plaintiff commit any crime or offense, defendants falsely informed employees of the Kings County District Attorney's Office that they had observed plaintiff commit several crimes including criminal sale of a controlled substance, denying plaintiff his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. (Id. ¶¶ 26, 27, 42-46). Additionally, plaintiff alleges that those defendants who were present but did not actively participate in the unlawful conduct, failed to prevent such conduct, despite a duty to intervene, and in so doing violated the plaintiff's Fourth, Fifth, Sixth, and Fourteenth Amendment rights. (Id. ¶¶ 47-50). Finally, plaintiff brings a Monell claim against the City of New York, alleging that the City, through

---

[1]Citations to "Am. Compl." refer to the Amended Complaint, filed on November 30, 2015.

policies, practices, and customs, directly caused the constitutional violations allegedly suffered by the plaintiff. (Id. ¶¶ 51-58).

On October 25, 2015, plaintiff was arraigned in Kings County Criminal Court and released on his own recognizance after approximately twelve hours in custody. (Id. ¶ 29). On March 4, 2015, after appearing in criminal court several times, all criminal charges against plaintiff were dropped. (Id. ¶ 30). As a result of defendants' conduct, plaintiff claims that he was "deprived of his liberty, suffered emotional distress, mental anguish, fear, pain, anxiety, embarrassment, humiliation, an unlawful strip search and damage to his reputation." (Id. ¶ 31).

Discovery is ongoing. On September 22, 2016, plaintiff deposed defendant Essig. According to plaintiff, defendants' counsel objected to plaintiff's questions over 600 times across 83 percent of the pages of the deposition transcript. (See 10/12/16 Pl.'s Ltr.[2] at 5).

During the deposition, defendants' counsel objected to a question posed by plaintiff's counsel, asking Essig what he remembered happening on October 24, 2014, the date of plaintiff's arrest. (Tr.[3] at 83). The parties agreed to call Judge Go's[4] chambers to seek guidance. Although Judge Go was unable to take the call, her law clerk instructed the parties that "objections should be short and concise and should be either to the form of the question and there is really nothing else that needs to be said, other than objection to form." (Id. at 90).

When questioning resumed, despite the clerk's instructions, defendants' counsel

---

[2] Citations to "10/12/16 Pl.'s Ltr." refer to plaintiff's letter, filed on October 12, 2016.

[3] Citations to "Tr." refer to transcript of John Essig's deposition, attached as Exhibit A to plaintiff's letter, dated October 12, 2016.

[4] At the time of the deposition, the case was assigned to the Honorable Marilyn D. Go. The case has since been reassigned to the undersigned.

frequently stated the grounds for her objections without being requested to do so by plaintiff's counsel. Many of defense counsel's numerous objections appear to have impacted the witness' responses. For example:

> Q    Did you see yourself on the video?
> A    Yes.
> Q    What were you doing?
> MS. BOOTH: Objection. Vague.
> A    What – where?

(Id. at 146).

On several occasions, specifically regarding defendants' counsel's more egregious objections, plaintiff's counsel demanded the reason for defense counsel's objections. For example:

> Q    What did you do for the rest of that tour?
> A    As far as what? As far as what's in my memo book or as far as what I –
> Q    No, I'm not interested in your memo book. I want to know what you did.
> MS. BOOTH: Objection. Asked and answered.
> A    When? After, after what?
> Q    After you left Hector Cordero in the cell?
> A    I finished processing my other arrest.
> Q    What did that involve?
> MS. BOOTH: Objection. He's not going to testify about the other arrests, unrelated arrests.
> MR. HARVIS: You're directing him not to answer the question?
> MS. BOOTH: I am directing him not to testify about other arrests on that day.
> MR. HARVIS: On what grounds?
> MS. BOOTH: That may be protected under the law.

(Id. at 263-64).

Ms. Booth instructed the witness not to answer questions at least twenty (20) times. For example:

4

> Q   Do you have Detective Rubin's, like, phone number in your phone?
>
> MS. BOOTH: Objection. Direct him not to answer the question.

(Id. at 42). Additionally:

> Q   When – did you leave the room that the cells are in at that point?
> A   I don't recall.
> Q   Well, what's the next thing that you recall?
> A   As far as what?
> Q   As far as that tour, after you finished making sure that Rubin was secure while he was searching Hector Cordero?
>
> MS. BOOTH: Anything after his involvement with the plaintiff ended, is beyond the scope of this deposition.
>
> MR. HARVIS: Let's agree to disagree about that.
>
> MS. BOOTH: I'm going to direct him not to answer.

(Id. at 250). At one point, the following colloquy occurred:

> Q   Do you know whether or not there was a TAC meeting on October 23, 2014?
>
> MS. BOOTH: Objection. And I'm directing the witness to not answer that question. It has been asked and answered several times.
>
> MR. HARVIS: It's not an objection.
>
> MS. BOOTH: Well, its harassment.
>
> MR. HARVIS: To ask if there was a TAC meeting is harassment?
>
> MS. BOOTH: You went through a very long series of questions in regard to TAC plans, TAC meetings, whether one occurred on this day. We're not going back down that road.
>
> MR. HARVIS: I can ask him any questions I want.
>
> MS. BOOTH: I'm directing him not to answer because that is harassment.
>
> MR. HARVIS: I can ask him about it as many times as I want.
>
> MS. BOOTH: I'm directing him not to answer.
>
> MR. HARVIS: Okay, fine. We'll make a record and then we'll move for costs.
>
> MS. BOOTH: Yes, that's what you do.
>
> Q   Did you – who led the TAC meeting that day?
>
> MS. BOOTH: Objection. I'm directing the witness not to answer that question.

> Q    Did you make any notes during the TAC meeting?
> MS. BOOTH: Objection. Directing the witness not to answer that question.
> Q    Were any handouts given out during the TAC meeting?
> MS. BOOTH: Objection. I'm directing the witness to not answer that question.

(Id. at 307-09).

At times, Ms. Booth directed her witness not to answer questions on the basis that they had already been asked and answered, even though they had not been answered. For example, early in the deposition, plaintiff's counsel asked defendant Essig, "What memo book entries are you required to make when you're working on a SNEU operation?" (Id. at 95). Ms. Booth objected on the grounds that the question "[c]all[ed] for speculation." (Id.) Counsel proceeded to have a discussion regarding whether Ms. Booth was permitted to state the grounds for her objections, and the question was never answered. (See id. at 95-96). Thus, plaintiff's counsel returned to the subject later in the deposition, and the following exchange occurred:

> Q    Do you know if there are any entries that are specifically required in your memo book, when you're doing a SNEU operation?
> MS. BOOTH: Objection. Asked and answered.
> A    I don't have that information of what's required.
> Q    But to your knowledge?
> MS. BOOTH: Objection. Asked and answered.
> MR. HARVIS: Asked and answered is not an appropriate objection.
> MS. BOOTH: Harassment.
> MR. HARVIS: None of those are.
> MS. BOOTH: It is harassment.
> MR. HARVIS: Okay, you can only say objection to form.
> MS. BOOTH: That is not –
> MR. HARVIS: That is what the court just said. We had it read back.
>
> MS. BOOTH: Like I said, it's harassment and if it continues, I'm

6

>> going to direct him not to answer the question. So
>> if you want to keep asking the same questions, that
>> is going to be the result.
> MR. HARVIS: Okay, that['s] fine.
> Q   Based on your training in the SNEU training, did you learn
>> when you train[ed] in the SNEU training about any
>> particular type of memo book entries that had to be made
>> for that kind of operation?
> MS. BOOTH: Objection. Harassment. I'm directing my client
>> not to answer that question.

(Id. at 295-97). Plaintiff's counsel's question regarding what entries, if any, were required to be included in defendant Essig's memo book, was never answered.

Ms. Booth instructed her witness not to answer other questions on the grounds of relevance and harassment, as well. For example:

> Q   This is from the City payroll records. Does this document
>> accurately reflect, to the best of your knowledge, your base
>> pay and total pay for the years 2014 through 2016?
> MS. BOOTH: Objection. I'm going – I need to inquire, what is the
>> basis of you asking him about his salary?
> MR. HARVIS: I would like to know if this information on this
>> form is accurate and he would know that.
> MS. BOOTH: What is the basis of that information? I'm going to
>> direct him not to answer that question.
> MR. HARVIS: On what ground?
> MS. BOOTH: I don't see how it's even remotely relevant and I
>> find it to be harassing.
> MR. HARVIS: It's harassing to – first of all, it goes to punitive
>> damages. There is case law in the Second Circuit
>> up and down, about how you are allowed to find out
>> the economic means of someone, assessment of
>> damages because the City doesn't pay that. So I
>> don't have to do it based on this document, I can
>> just ask him. But it's certainly a legitimate line of
>> questioning to find out, like, how much he earns in
>> overtime each year.
> MS. BOOTH: I don't – I'm going to direct him not to answer that
>> question at this point.
> MR. HARVIS: On what grounds?

7

>           MS. BOOTH: Based on what I just said.
> (Id. at 389-91).

There were also several occasions when Ms. Booth did not directly instruct the witness not to answer, but effectively made comments suggesting the answers to the witness. For example:

> Q    To your knowledge, have any of the other officers that you worked with on SNEU at the 83rd precinct, become detectives?
> MS. BOOTH: Objection. Only if you have that information.
> A    I don't have that information.

(Id. at 41).

The parties later called the Court once again, and Judge Go directed defendants' counsel that, if she had objections to specific questions, rather than instructing her witness not to answer, she should "[a]sk the court reporter to mark the questions and just focus on the issues, rather than, you know, rather than quibbling over procedures and conduct. But just move forward and finish up." (Id. at 334-35). To the extent that defendants' counsel believed a question had already been asked and answered, Judge Go instructed counsel, "don't jump to the conclusion that simply because [a question] overlaps with a prior question, that it's not a different question. Just, if you think it's an objectionable question because it was previously asked, [g]o now and have the court reporter mark it and we'll go back to see who is correct on that." (Id. at 337). Even after this instruction, defendants' counsel proceeded to instruct Essig not to answer questions. For example, when Essig was asked to confirm whether certain payroll records were accurate, defendants' counsel stated, "I'm going to direct him not to answer that question. . . . I don't see how it's even remotely relevant and I find it to be harassing." (Id. at 390). When Essig

was then asked about the amount of overtime pay he received, counsel stated:

> MS BOOTH: Objection. I'm going to direct him not to answer this line of questioning. The overtime in regards to this arrest, is one thing, but to ask him about his salary and how much he's earned in overtime, in general, is irrelevant. And the judge already ruled that she believes the overtime in general in this case, that information was very – not really relevant. So I mean, if you want to take it up with the court, that's fine.

(Id. at 391-92). Plaintiff's counsel's questions regarding Essig's pay or overtime compensation were not answered during the deposition.

Defendants' counsel also threatened to leave the deposition on several occasions, claiming that questions were harassing to Essig. For example, after the above discussion regarding the TAC meeting, the following exchange occurred:

> MS. BOOTH: I am going to state on the record that the questions have been harassing throughout this process. They have been asked and answered repeatedly, over and over again. And I am going to ask now, if you have a new, different question to ask my client, please ask it. If you do not, then we are going to be leaving.
> MR. HARVIS: Okay, well, you can leave if you want, but the deposition is not over.
> MS. BOOTH: We will be leaving if you do not ask a different, new question, we are leaving because I find this to be harassment.

(Id. at 311).

Since the conclusion of the Essig deposition, the parties have conducted additional depositions. (11/4/16 Defs.' Ltr.[5] at 2). Both parties agree that following the Essig deposition

---

[5] Citations to "11/4/16 Defs.' Ltr." refer to defendants' letter in opposition, filed on November 4, 2016.

the relationship between plaintiff's counsel and defendants' counsel has improved. (See 11/10/16 Pl.'s Ltr.[6] at 1; see also 11/4/16 Defs.' Ltr. at 2). However, on April 19, 2017, the parties contacted the Court twice regarding disputes that arose during plaintiff's deposition.

## DISCUSSION

### A. Legal Standard

Rule 30(c)(2) of the Federal Rules of Civil Procedure provides that "[a]n objection [during a deposition] must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). "[R]elevance or the lack thereof does not provide a basis to direct a witness not to answer a question." Weinrib v. Winthrop-University Hosp., No. 14 CV 953, 2016 WL 1122033, at *3 (E.D.N.Y. Mar. 22, 2016) (citing Balk v. New York Inst. of Tech. No. 11 CV 509, 2012 WL 5866233, at *2 (E.D.N.Y. Nov. 19, 2012); Severstal Wheeling Inc. v. WPN Corp., No. 10 CV 954, 2012 WL 1982132, at *2 (S.D.N.Y. May 30, 2012); Luc Vets Diamant v. Akush, No. 05 CV 2934, 2006 WL 258293, at *1 (S.D.N.Y. Feb. 3, 2006)). Rule 30(d)(2) authorizes the Court to sanction any person who "impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). To impose sanctions, a Court need not find that a party acted in bad faith. See Sicurelli v. Jeneric/Pentron, Inc., No. 03 CV 4934, 2005 WL 3591701, at *8 (E.D.N.Y. Dec. 30, 2005). Rather, the only requirement for sanctions is that

---

[6] Citations to "11/10/16 Pl.'s Ltr" refer to plaintiff's letter in reply, filed on November 10, 2016.

the fair examination of the deponent was frustrated, impeded, or delayed. Fed. R. Civ. P. 30(c)(2). The decision to impose sanctions is at the discretion of the court. See Sicurelli v. Jeneric/Pentron, Inc., 2005 WL 3591701, at *8. "The making of an excessive number of unnecessary objections may itself constitute sanctionable conduct." Fed. R. Civ. P. 30 advisory committee's note to 1993 amendment.

However, courts in the Second Circuit have declined to impose sanctions based solely on voluminous, unwarranted, and argumentative objections where opposing counsel was not prevented from completing the deposition. See, e.g., Phillips v. Manufacturers' Hanover Trust Co., No. 92 CV 8527, 1994 WL 116078, at *3 (S.D.N.Y. March 29, 1994) (declining to issue sanctions, even when the attorney's conduct "clearly hampered the free flow of the deposition," and was "inappropriate and at times even obnoxious"). On the contrary, sanctions have been imposed where counsel's interruptions, while not necessarily in bad faith, included repeated improper instructions for the witness not to answer, preventing the deposing party from completing the deposition. See Morales v. Zondo Inc., 204 F.R.D. 50, 53-54 (S.D.N.Y. 2001).

B. Analysis

By letter dated October 12, 2016, plaintiff moved for an Order awarding costs, pursuant to Rule 30(d)(2), based on defendants' counsel allegedly impeding, delaying, or frustrating the fair examination of the plaintiff's deposition of defendant Essig on September 22, 2016. (See 10/12/16 Pl.'s Ltr. at 5). More specifically, plaintiff alleges that his questioning of Essig "was frustrated by defense counsel's speaking objections . . . to the point that [the] deposition was futile." (Id. at 1). In support of this argument, plaintiff asserts that "over 750 statements from

11

[defendants' counsel] appear in the record, including over 600 objections across 84% of the examination's pages." (Id. at 5).

Plaintiff also alleges that defendants' counsel ignored the guidance given by the Court's clerk, arguing that "[w]hen questioning resumed, defense counsel's objections became more aggressive, despite the guidance received during the call – [defendants' counsel] incessantly interrupted the examiner to declare that questions called for speculation, were vague, leading or had been asked and answered." (Id. at 2). Finally, plaintiff contends that "[d]efense counsel repeatedly instructed the witness not to answer basic questions and threatened to leave." (Id. at 4). As a result of the alleged behavior; plaintiff contends that defendants' counsel impeded the fair examination of defendant Essig and plaintiff seeks sanctions against the defendants in the form of an order requiring them to pay the plaintiff's costs associated with the Essig deposition. (Id. at 1).

In response, defendants claim that "defendant Essig gave responsive answers to questions, sought clarification when he did not understand a question, and provided a full account of the disputed events." (11/4/16 Defs.'s Ltr. at 1). They contend that "defense counsel sought to preserve form objections, to provide plaintiff's counsel reasonable opportunity to correct the form of a question, to preserve a privilege, enforce a court limitation, and avoid abuse and harassment of the witness." (Id.) Defendants further claim that counsel's actions were meritorious and were not taken to harass or delay the deposition, and were not taken in bad faith. (Id. at 3-4).

Defendants also argue that defendants' counsel's instructions not to answer were proper. (Id. at 5). They contend that, "[w]hile defense counsel did direct the witness not to answer

certain questions, that direction was given to either: to [sic] protect privilege/protected information, to protect a limitation ordered by the court, or to protect the witness from the abuse, harassment and humiliation from the plaintiff." (Id.)

Defendants also argue that plaintiff was "not using the deposition as a discovery device but rather as a means to harass the witness into giving him particular testimony and to punish the defendants for deposing plaintiff for almost seven hours, the day prior." (Id. at 2). In support of this allegation, defendants note that plaintiff did not request any remedy associated with gathering additional testimony from Essig, but rather, only seeks monetary damages. (See id. at 14-15).

In reply, plaintiff asserts that his counsel has never previously sought sanctions for the deposition conduct of an adversary, and does not do so lightly. (11/10/16 Pl.'s Ltr. at 1). Plaintiff also urges the Court to reject defendants' comparison between defendants' counsel's allegedly inappropriate objections and plaintiff's counsel's efforts to overcome them. (Id.)

Courts in the Second Circuit have described a deposition as:

> a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness – not the lawyer – who is the witness.

Abu Dhabi Commercial Bank, et. al. v. Morgan Stanley & Co. Inc., No. 08 CV 7508, 2011 WL 4526141, at *7 (S.D.N.Y. Sept. 21, 2011) (citing Hall v. Clifton Precision, 150 F.R.D. 525, 528 (E.D. Pa. 1993)).

13

In the instant case, defendants' counsel repeatedly instructed Essig not to answer, failed to limit her objections to the statement "objection as to form," and threatened to leave the deposition on multiple occasions. (See supra at 3-9). The behavior of defendants' counsel clearly impeded the progress of and unnecessarily extended the length of the deposition, particularly given that certain questions, including whether there were any requirements for memo book entries, were left unanswered.

As an initial matter, defendants' counsel acted improperly by not limiting objections to the statement "objection as to form" as directed by the Court. (Tr. at 90). Frequently counsel's objections included extraneous comments, such as that questions called for speculation, were vague, leading or had been asked and answered; at times, her comments seemed to be suggesting answers to the witness. (See, e.g., id. at 33-34 ("Q: And did the members of that team change during the time you were at the 83rd?; MS. BOOTH: Objection. That's a very broad question. You're asking did the team – how would he know that?")). This improper behavior proceeded even after the Court's law clerk instructed defendants' counsel to limit her comments to "objection as to form" unless the plaintiff's counsel inquired into the reasoning of her objection. (See e.g., Tr. at 94 ("Q: Is one person called the operator, one person called the recorder?; MS. BOOTH: Objection, leading"); id. at 102 ("Q: And who prepared that form?.... MS. BOOTH: Objection. Calls for speculation")).

To the extent that defendants argue that their counsel acted to protect a witness who did not understand plaintiff's questions, it is well-established that the witness, not the witness's counsel, "should make the determination as to whether a question is clear and answer to the best of his or her ability." Severstal Wheeling Inc. v. WPN Corp., 2012 WL 1982132, at *2 (quoting

14

Phillips v. Manufacturers Hanover Trust Co., 1994 WL 116078, at *4). While it is impossible to determine how Essig would have answered but for defendants' counsel objections, it appears that, on at least several occasions, Essig's answers may have been influenced by defendants' counsel's objections. (Tr. at 146 ("Q: What were you doing?; MS. BOOTH: Objection. Vague.; A: What - - Where?"); id. at 134 ("Q: What happened inside the mini mart?; MS. BOOTH: Objection. Vague.; A: What I did?").

In addition to the plethora of speaking objections, defendants' counsel also repeatedly instructed the witness not to answer questions that were relevant to the case on the grounds that they were not relevant or had been "asked and answered." (See supra at 3-9). Contrary to defendants' claim, none of these questions seem to be asking for privileged information and lack of relevance is not an appropriate objection to raise during a deposition. See Weinrib v. Winthrop-University Hosp., 2016 WL 1122033, at *3. A review of the transcript reveals that claims of privilege were rarely asserted. Indeed, the vast majority of counsel's instructions not to answer appear to be based on assertions that the questions had been previously "asked and answered" or were not relevant; neither of these grounds is a proper basis for instructing a witness not to answer in a deposition. (See supra at 10).

In denying plaintiff access to this relevant information, defendants' counsel denied plaintiff the right to have deposition questions answered. Here, the witness, an NYPD Police Officer with nearly five (5) years on the job did not indicate that he could not understand English (Tr. at 26), was told at the beginning of the deposition to indicate if he did not understand a question (id. at 20-22), and never stated he did not understand a question unless prompted by counsel's objections. (See, e.g., id. at 46 ("Q: And then – and then if they see it, what do they

15

do?; MS. BOOTH: Objection. Can you clarify the question?; Q: Do you understand what I'm asking?; MS. BOOTH: Do you understand the question?; A: No, clarify it, please. I would appreciate it, thank you"); id. at 56 ("Q: The scenario that you were trained in, was that a scenario where the cb officers were looking at one set?; MS. BOOTH: Objection. Calls for speculation. That was not in his testimony.; MR. HARVIS: I'm asking what his training was.; MS. BOOTH: Do you understand the question? And if you can answer the question, based on his question.; A: Could you just say it one more time, please?"). Defendants' counsel's improper conduct in instructing the witness not to answer questions continued even after an explicit instruction from the judge. (See supra at 8-9). Notwithstanding Judge Go's instructions, instead of marking questions for a subsequent ruling, defendants' counsel instructed her client not to answer questions regarding his compensation on the grounds that such questions were irrelevant, resulting in those questions being left unanswered. (Tr. at 389-92).

Defendants' counsel's behavior is similar to that in which courts have granted sanctions in the past. See Morales v. Zondo, 204 F.R.D. at 54 (granting sanctions where "private consultations with the witness, instructions not to answer, instructions how to answer, colloquies, interruptions, and ad hominem attacks disrupted the examination"); see also Sicurelli v. Jeneric/Pentron, Inc., 1994 WL 116078, at *2 (granting sanctions where a plaintiff's counsel made argumentative and unprofessional comments to opposing counsel, instructed the witness not to answer, and walked out of the room in the middle of the deposition). Accordingly, the Court Orders the defendants' counsel to pay the plaintiff's costs associated with the deposition of defendant Essig, and grants the plaintiff an additional opportunity to depose defendant Essig.

## CONCLUSION

In light of the foregoing, plaintiff's motion for sanctions is granted. Defendant is ordered to pay reasonable attorneys' fees and costs associated with the deposition of Essig. The parties are directed to meet and confer regarding an appropriate amount of fees to be paid by May 26, 2017. If the parties are unable to come to an agreement, plaintiff is directed to file a letter with the Court, including a proposed hourly rate and billing statements reflecting the hours requested, by June 9, 2017. Defendants' response is due June 23, 2017. Plaintiff may reply by June 30, 2017.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
May 12, 2017

/s/ Cheryl Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York