UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

HECTOR CORDERO,

                                            Plaintiff,    **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1**

                -against-

                                                      15-CV-3436 (JBW)(CLP)

CITY OF NEW YORK; Police Officer HUGO HUGASIAN, Shield No. 10228; Lieutenant CHRISTOPHER MORAN, Police Officer PAUL PALMINTERI, Shield No. 18460; Police Officer MARCO ARTALE, Shield No. 25158; Police Officer PETER RUBIN, Shield No. 00934; Police Officer JOHN ESSIG, Shield No. 08667; Police Officer LYNETTE REYES, Shield No. 26626; Police Officer RAUL NAREA, shield No. 07493; JOHN and JANE DOE 1 through 10, individually and in their official capacities (the names John and Jane Doe being fictitious, as the true names are presently unknown),

                                            Defendants.

------------------------------------------------------------------------- X

        Defendants City of New York, Hugo Hugasian, Christopher Moran, Peter Rubin and John Essig submit this statement pursuant to Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, to set forth the material facts as to which they contend there are no genuine issues to be tried:

## PROCEDURAL HISTORY

1.    On June 12, 2015, plaintiff filed a Complaint against the City of New York and John Doe defendants in the United States District Court for the Eastern District of New York. (See Civil Docket Sheet, entry #1).

2.    On November 30, 2015, plaintiff filed an Amended Complaint against defendants City of New York, Hugo Hugasian, Christopher Moran, Paul Palminteri, Marco Artale, Peter Rubin,

John Essig, Lynette Reyes and Paul Narea setting forth claims for unlawful stop and search, false arrest, malicious prosecution, denial of a right to fair trial, failure to intervene and <u>Monell</u>. (<u>See</u> First Amended Complaint, annexed to the Declaration of Amatullah Booth as Exhibit A).

3. The allegations underlying plaintiff's Monell claim are: (1) that the City's hiring practices are faulty resulting in "the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the constitution" and (2) that the City has a "*de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence and perjury." (<u>See</u> Exhibit A, ¶¶ 54, 55).

4. On July 31, 2017, the parties filed a Stipulation of Partial Dismissal and Withdrawal agreeing that all claims are to be dismissed with prejudice against defendants Paul Palminteri, Marco Artale, Lynette Reyes and Raul Narea. (<u>See</u> Civil Docket Sheet, entry # 99).

### THE EVENTS IN THE VICINITY OF IRVING AVENUE AND JEFFERSON STREET ON OCTOBER 24, 2014

5. On October 24, 2014, members of the 83rd Precinct Street Narcotics Enforcement Unit were conducting observations in the vicinity of Irving Avenue and Jefferson Street, a drug prone location. (<u>See</u> Relevant portions of the Deposition of Christopher Moran, annexed to the Declaration of Amatullah Booth as Exhibit B, 85:20-25; 103:4-11).

6. This area was a known narcotics location because, through civilian complaints and officer observations, individuals frequently made narcotic transactions at that location and in its vicinity. (<u>See</u> Exhibit B, 103:12-21; <u>see also</u> Relevant portions of the Deposition of Peter Rubin, annexed to the Declaration of Amatullah Booth as Exhibit C, 131:3-9).

7. Officer Hugasian was the observation officer who was alone in a vehicle conducting narcotics observations. (<u>See</u> Relevant portions of the Deposition of Hugo Hugasian, annexed to

the Declaration of Amatullah Booth as Exhibit D, 144:9-11, 147:5-12; <u>see</u> also Exhibit B, 131:17 – 132:11).

8. Officers Rubin and Essig were assigned to one of the apprehension vehicles. (<u>See</u> Exhibit C, 123:24 – 125:4; <u>see</u> also Relevant portions of the Deposition of John Essig, annexed to the Declaration of Amatullah Booth as Exhibit E, 119:17-20).

9. Lieutenant Moran was in another vehicle with Officer Palminteri. (<u>See</u> Exhibit B, 128:18 - 129:4).

10. Officer Hugasian observed the buyer (later learned to be Matthew Ninos) approach the vicinity of J&C Mini Mart on his cell phone with money in his hand. (<u>See</u> Exhibit D, 167:6 – 169:19).

11. Officer Hugasian observed an individual exit the Mini Mart (or bodega) and meet with Mr. Ninos, who handed money that was in his hand to the seller. In turn, the seller handed what appeared to be two little zips or bags, indicative of a narcotics transaction. (<u>Id.</u>, 183:17 – 185:8).

12. Officer Hugasian went over the radio stating that he observed a drug transaction and relayed the description of the buyer and the description of seller, who went back into the bodega on the corner of Irving Avenue and Troutman Street. (<u>Id.</u>, 185:15 – 186:24; <u>see</u> also Exhibit B, 135:13-19).

13. Lieutenant Moran and Officer Palminteri arrested the buyer, Mr. Ninos. (<u>See</u> Exhibit B, 135:13 - 136:19, 140:19-23, 146:19-24).

14. Mr. Ninos had two twists of crack cocaine in his hand which he threw to the ground upon seeing the officers approaching him. (<u>Id.</u>, 141:3-25).

15. Mr. Ninos pled guilty to possessing crack cocaine at approximately 1:20 p.m. in the vicinity of Irving Avenue and Jefferson Street, Brooklyn, New York. (See Relevant portion of Mr. Ninos' plea allocution, annexed to the Declaration of Amatullah Booth as Exhibit F).[1]

16. Officers Rubin and Essig received the radio transmission from Officer Hugasian and went to apprehend the seller who went inside the bodega. (See Exhibit C, 134:12-24, 138:6-10; see also Exhibit E, 118:24 - 119:9, 122:7-14, 122:18-21, 133:3-15).

17. Officers Rubin and Essig entered the bodega, exited shortly thereafter and asked Officer Hugasian, over the radio, to identify the seller because two people in the bodega matched the description put over the radio by Officer Hugasian. (See Exhibit C, 137:15-22, 140:14 – 141:16; see also Exhibit E, 131:4-12, 134:6 – 135:2, 138:5-10, 141:4 – 142:8).

18. Officer Hugasian went into the bodega, purchased a bottle of water, and after exiting, informed Officer Rubin that the seller was the one behind the counter. (See Exhibit D, 200:23 – 201:25; see also Exhibit C, 143:18 - 144:4).[2]

19. Officer Rubin spoke to the store owner, Mr. Tineo, and asked that he instruct plaintiff to come outside of the store to be arrested. (See Relevant portions of the Deposition of Plaintiff,

---

[1] Defendants will not file the transcript of the plea allocution publically, but instead will provide the Court with the relevant transcript in hardcopy.

[2] Plaintiff claims he never left the store that day. (Exhibit G, 168:7-9). Notwithstanding this claim, the bodega had surveillance cameras, specifically one that faced the front door of the store. (Id., 110:3-5, 14-19). About three weeks after his arrest, plaintiff reviewed the surveillance footage and recorded a portion of it on his Ipad. (Id., 137:19 – 138:10). Although there was footage for the entire day, plaintiff only recorded and preserved the video starting with when the officers first entered the store. (Id., 142:25 – 143:8). Plaintiff did not record and preserve the footage that would have showed him either exiting the store to engage in the alleged drug transaction – which would support Officer Hugasian's version of events – or remaining in the store – which would support his claim of innocence. (Exhibit G, 169:11-25). All of the surveillance footage was deleted after plaintiff had access to it, either one month or two months after the date of arrest. (Id., 138:8-23).

annexed to the Declaration of Amatullah Booth as Exhibit G, 116:10-14, 119:10-16; see also Exhibit C, 147:9-23, 149:6-16; see also Exhibit E, 201:8-17).

20. Once plaintiff stepped outside of the store, Officers Rubin and Essig handcuffed plaintiff and placed him in their police car. (See Exhibit G, 121:20-25; see also Exhibit C, 151:5-14; see also Exhibit E, 208:2-15, 201:8-17 (the "individual behind the counter was under arrest and [we] asked him to step outside"); see also Exhibit A, ¶ 22 ("*suddenly* … defendants arrested Mr. Cordero and tightly handcuffed him.") (emphasis added).

### THE RECORD CONCERNING THE ALLEGED STRIP-SEARCH

21. According to plaintiff, an officer took him to a room where he was told to strip naked by this officer. (See Exhibit G, 130:23 – 131:1).

22. According to plaintiff, the officer looked at the clothes and then plaintiff put his clothes back on. (See Relevant portions from the Second Deposition of Plaintiff, annexed to the Declaration of Amatullah Booth as Exhibit H, 64:13-20).

23. According to plaintiff, no other officer was present in this room/cell. (See Exhibit G, 131:3-7; see also Exhibit H, 63:6-7).

24. According to plaintiff, he did not see any other officers outside the room/cell. (See Exhibit H, 63:4-5).

25. According to Officer Rubin, he placed plaintiff in a cell, removed plaintiff's handcuffs and then asked plaintiff to remove his belt and shoelaces. (See Exhibit C, 157:11-20; see also Exhibit E, 234:6-12).

5

26.     Plaintiff had $581 on him at the time of his arrest.  (See Exhibit G, 124:20-21).[3]

27.     Officer Essig did not conduct the search of plaintiff.  (See Exhibit E, 234:16-24).

28.     Officer Essig did not witness the search of plaintiff that was performed by Officer Rubin. (Id., 234:25 – 235:9).

29.     Officer Essig was close by during Officer Rubin's search of plaintiff for safety reasons, meaning if plaintiff decided to fight Officer Rubin, he would be able to help.  (Id., 235:10-16).

## THE INVOLVEMENT OF THE OFFICERS

Officer Hugasian

30.     The only team member to observe plaintiff's alleged drug transaction was Officer Hugasian.  (See Exhibit B, 135:9-12; see also Exhibit E, 294:2-19).

31.     Officer Hugasian did not search plaintiff, nor did he observe any search of plaintiff at the precinct.  (See Exhibit D, 273:13-21).

Officer Essig

32.     Officer Essig did not personally observe plaintiff sell drugs on October 24, 2014.  (See Exhibit E, 118:14-19).

Officer Rubin

33.     Officer Rubin did not personally observe plaintiff involved in a drug sale.  (See Exhibit C, 153:2-4).

---

[3] There is some dispute over the exact amount of money, but there is no dispute that plaintiff had at least $580 on his person at the time of his arrest.

Lieutenant Moran

34. Lieutenant Moran did not personally observe plaintiff make a drug sale on October 24, 2014. (See Exhibit B, 135:6-8).

35. Lieutenant Moran transported Mr. Ninos back to the precinct and was not present for the arrest of plaintiff. (Id., 147:25 – 149:5).

36. At the precinct, Lieutenant Moran was informed by Officer Hugasian that he observed plaintiff sell drugs to the buyer, Mr. Ninos. (Id., 153:9-20, 158:18-22).

37. Based on what Officer Hugasian said, Lieutenant Moran verified the arrests of plaintiff and Mr. Ninos. (Id., 175:15-24).

38. Lieutenant Moran saw plaintiff at the precinct waiting to be placed into the cell. (See Exhibit B, 162:17 – 163:2)

39. Lieutenant Moran did not see plaintiff placed in the cell and did not observe any search of plaintiff. (Id., 163:3-7).

Dated:  New York, New York
        August 3, 2017

By: _____/s/_____
    AMATULLAH BOOTH