UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
HECTOR CORDERO,

                    Plaintiff,                          15 CV 3436 (JBW) (CLP)

              -against-

CITY OF NEW YORK; Police Officer HUGO
HUGASIAN, Shield No. 10228; Lieutenant
CHRISTOPHER MORAN; Police Officer PETER
RUBIN, Shield No. 00934; Police Officer JOHN
ESSIG, Shield No. 08667),

                    Defendants.
-------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**HARVIS & FETT LLP**
Gabriel P. Harvis, Esq.
305 Broadway, 14th Floor
New York, New York 10007

*Attorneys for plaintiff*

August 21, 2017

<u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT..............................................................................1

STATEMENT OF FACTS ..................................................................................2

      A. The Arrest and Prosecution of Hector Cordero .................................. 2

      B. The Falsified Overtime Requests of Hugasian and Essig..................7

THE SUMMARY JUDGMENT STANDARD ......................................................10

ARGUMENT

   POINT I

      DEFENDANTS' MOTION SHOULD BE DENIED AS UNTIMELY. 11

   POINT II

      DEFENDANTS HAVE MISTREATED THE RECORD ...................... 13

   POINT III

      RUBIN AND ESSIG STOPPED, INTERROGATED AND FALSELY
      ARRESTED PLAINTIFF ....................................................... 15

   POINT IV

      ESSIG CONCEDES PERSONAL INVOLVEMENT IN PLAINTIFF'S
      ILLEGAL STRIP SEARCH ................................................... 16

   POINT V

      THE EVIDENCE SUPPORTS *MONELL* LIABILITY.......................... 17

   POINT V

      THE EVIDENCE SUPPORTS SUPERVISORY LIABILITY................ 24

CONCLUSION ................................................................................. 25

## Preliminary Statement

Plaintiff respectfully submits that defendants' belated, non-dispositive motion lacks merit, dishonors the record and was conceived as a delay tactic by defendants who have already been sanctioned in this very litigation for obstructive conduct. *Cordero v. City of New York*, ___ F. Supp. 3d ____, 2017 WL 2116699 (E.D.N.Y. 2017). Plaintiff respectfully requests that the Court deny defendants' motion in all respects and schedule the matter for trial.

## Statement of Material Facts

The facts of this textbook false arrest case, drawn from the First Amended Complaint, are summarized in the May 12, 2017 decision imposing sanctions. *Id.* at *1.

### A.    The Arrest and Prosecution of Hector Cordero

Plaintiff Hector Cordero is a diligent and law-abiding 58-year-old bodega clerk and former police officer from the Dominican Republic who is a naturalized citizen of the United States. *See* Testimony of Hector Cordero ("Cordero Dep."), p. 18, ln. 1-6, ln. 24-25, p. 20, ln. 2-6, annexed to the Declaration of Gabriel P. Harvis, dated August 21, 2017 ("Harvis Decl.") as Exhibit ("Exh.") 1. Since July 2013 Mr. Cordero has worked at J&C Minimarket in Brooklyn ("J&C"), where he is a valued employee. *See* Letter from F. Tineo dated June 13, 2016, annexed to Harvis Decl. as Exh. 2 (describing

Mr. Cordero as a "timely, honest and hardworking person" who "because of his excellent record" is "an asset to [the] business").

Mr. Cordero alleges that he was working behind the counter at J&C on the afternoon of October 24, 2014 when defendants Essig and Rubin entered the store, conducted a six-minute investigation and then ordered plaintiff outside and arrested him, lacking probable cause or a warrant.[1] *Cordero v. City of New York*, ___ F. Supp. 3d ____. The officers who arrested Mr. Cordero were part of an NYPD Street Narcotics Enforcement Unit ("SNEU") team supervised by defendant Lieutenant Christopher Moran, who was then the 83rd Precinct's SNEU Sergeant.[2] *See* Testimony of Lt.

---

[1] Plaintiff's account is corroborated by footage from surveillance cameras inside J&C, which Mr. Cordero preserved and produced in discovery despite a lack of access to the store's equipment. *See* Video Surveillance, annexed to Harvis Decl. as Exh. 3. In the footage, defendants Essig and Rubin are first seen stepping into J&C (in uniform) and walking out 20 seconds later. *Id.* at 13:04:20-13:04:40. Defendant Hugasian (in plainclothes wearing a fleece) then walks in, stays for about a minute, buys a bottle of water and leaves. *Id.* at 13:05:46-13:06:44. Essig and Rubin then return and speak to plaintiff, who is seen referring them to Mr. Tineo, the store owner. *Id.* at 13:07:18. Tineo and Rubin then speak outside of the store as Essig remains with Mr. Cordero. *Id.* at 13:07:34-13:09:06. When Tineo returns, plaintiff steps out from behind the counter and is taken into custody. *Id.* at 13:09:36-13:09:41.

[2] There is conflicting evidence concerning Moran's whereabouts in the hours surrounding plaintiff's arrest, and the timing of the arrest itself. According to official NYPD records, defendant Moran was the supervisor on scene to verify plaintiff's arrest in front of J&C at 1:40 p.m. *See* Omniform Complaint Report, annexed to Harvis Decl. as Exh. 22 ("Supervisor on Scene: Christopher Moran"); *see also* Command Log, annexed to Harvis Decl. as Exh. 20 ("Supervisor Verifying Arrest: Moran"). But at his deposition, Moran testified that he had left the scene before plaintiff was arrested. *See* Moran Dep., annexed to Harvis Decl. as Exh. 4, p. 149, ln. 3-9. However, Moran's memo book (which inaccurately records the Niños arrest at 12:30 p.m., when it was officially documented as 1:20 p.m.) does not support that account; it reflects Moran remaining on the scene until 2:00 p.m., allowing ample time for him to have verified plaintiff's arrest. *See* Lt. Moran memo book, annexed to Harvis Decl., as Exh. 26. Indeed, leaving the scene as Moran testified he did would have contravened the NYPD Patrol Guide, which mandates that a supervisor remain on scene during SNEU operations. *See*

Christopher Moran, annexed to Harvis Decl. as Exh.4; *see also* SNEU TAC Plan, annexed to Harvis Decl. as Exh. 5.

Once in custody, plaintiff alleges that defendants Peter Rubin and John Essig interrogated him in their police vehicle, leading to the following exchange:

> Inside the car they were asking me if I came out of the store, and I told them I never left the store. And I overheard [Essig] telling [Rubin], saying, "I told you."

Cordero Dep., Harvis Decl., Exh. 1, p. 120, ln. 20 through p. 121, ln. 3. Rubin and Essig, without noting the events in their memo books as required, then took Mr. Cordero from the scene to the 83rd Precinct and, under the authority of defendant Moran, subjected plaintiff to an illegal strip search in the absence of reasonable suspicion.[3] *See* Cordero Dep., Harvis Decl., Exh. 1, p. 64, ln. 13-20 and p. 130, ln. 23 through p. 131. Ln. 2; *see also* Essig I Dep., Harvis Decl., Exh. 29, p. 235, ln. 5-7, 17-20, p. 236, ln. 6-11, 22, p. 237 ln. 19 through p. 238, ln. 3, 8-10; *see also* Defendant Essig and Rubin's memo book entries, annexed to Harvis Decl. as Exhibit 6.

---

PG § 212-116, annexed to Harvis Decl. as Exhibit 27, § (d) ("*SNEU operations **will not** be conducted unless … a supervisor [is] present.*") (emphasis in original). The foregoing facts are themselves in conflict with the J&C video surveillance preserved by plaintiff, which shows plaintiff leaving the store at 1:10 p.m., thirty minutes before his official arrest time. *See* Surveillance Video, annexed to Harvis Decl. as Exh. 3. The defense has offered no explanation for these discrepancies, and plaintiff respectfully submits that they alone raise sufficient triable issues of fact to defeat defendants' motion.

[3] Notably, in 2012 a jury in this district awarded $10,000 in punitive damages and $5,000 in compensatory damages to a plaintiff who defendant Peter Rubin was found to have illegally strip searched at the 83rd Precinct. *Brown v. City of New York*, 10 CV 4675 (ERK) (LB) (verdict sheet annexed to Harvis Decl. as Exhibit 30).

Defendants, who bear the burden with respect to probable cause, *Dickerson v. Napolitano,* 604 F.3d 732, 751 (2d Cir. 2010), purport to rely exclusively on the alleged observation of defendant Hugo Hugasian, a witness who confidential records indicate could hardly be more compromised.[4] However, there is every indication that Essig, Rubin and Moran were directly involved in the decision to arrest and strip search Mr. Cordero. *See* Command Log, annexed to Harvis Decl. as Exhibit 20; Omniform Complaint Report, Harvis Decl., Exh. 20; see also, Cordero Dep., Harvis Decl., Exh. 1, p. 124, ln. 6-14 and p. 120, ln. 20 through p. 121, ln. 3 (in which plaintiff describes being interrogated by Rubin and Essig inside a police vehicle, and Essig acknowledges the absence of probable cause).

In any event, the video evidence preserved by Mr. Cordero shows that plaintiff was the sole clerk tending to a steady stream of customers and that he simply could not have been involved in a drug sale on the sidewalk as defendants claim. *Compare* Surveillance Video, Harvis Decl., Exhibit 3 (showing plaintiff working behind the counter as of 1:04 p.m. and then taken into custody at 1:10 p.m.) *with* Complaint

---

[4] In accordance with the governing Stipulation of Confidentiality (DE #18), plaintiff is prohibited from filing the confidential material on the public docket. However, a copy of defendant Hugasian's relevant disciplinary records will be included in the courtesy copy of the instant motion when it is delivered to the Court, as Exhibit 9 to the Harvis Decl.

Report, Harvis Decl., Exhibit 22 (accusing Mr. Cordero of selling drugs in front of the store from 1:15 to 1:40 p.m.).

No drugs or contraband were recovered during plaintiff's arrest. *See* Testimony of defendant Hugo Hugasian ("Hugasian Dep."), annexed to Harvis Decl. as Exhibit 10, p. 220, ln. 2-7. Indeed, even though Mr. Cordero had purportedly been seen stepping out from behind the counter and selling drugs on the sidewalk in broad daylight, the officers testified (and the video preserved by plaintiff confirms) that the officers never: 1) searched behind the counter for a stash; 2) reviewed or vouchered the surveillance video; 3) asked (or notified) the store owner, Mr. Tineo, about his employee's conduct;[5] 4) interviewed the Postal Worker in the bodega at the time (or anyone else there); 5) applied for a search warrant; or 6) told the NYPD drugs were being dealt from J&C.[6] *See* Surveillance Video, Harvis Decl., Exhibit 3; *see also* Hugasian Dep., Harvis Decl., Exh. 10, p. 233, ln. 18 through p. 234 ln. 16.

---

[5] Fausto Tineo, J&C's owner, testified that he repeatedly asked Rubin what the officers wanted with Mr. Cordero and Rubin refused to tell him. *See* Tineo Dep., Harvis Decl., Exh. 25, p. 146, ln. 9 through p. 147, ln. 17.

[6] According to the defendants, the NYPD had never received a report of drug dealing by J&C employees and the officers had made no prior arrests at that location. *See* Moran Dep., Harvis Decl., Exh. 4, p. 123, ln. 6-15; *see also* Testimony of Officer Peter Rubin ("Rubin Dep."), annexed to Harvis Decl. as Exhibit 8, p. 131, ln. 10-18; *see also* Hugasian Dep., Harvis Decl., Exh. 10, p. 162, ln. 20 through p. 163, ln. 12.

The officers did, however, confiscate approximately $580 from Mr. Cordero. *See* NYPD Property Voucher annexed to Harvis Decl. as Exh. 15. After defendant Hugasian vouchered the funds as "arrest evidence," Mr. Cordero was unable to retrieve the money for approximately a year. *See* Cordero Dep., Harvis Decl., Exh. 1, p. 136, ln. 1-3. The officers are unable to explain the chain of custody as to the funds taken from Mr. Cordero. *But compare* Essig Dep. II, p. 100, ln. 6-17, annexed to Harvis Decl. as Exhibit 7 (denying any role in recovering the money) *with* Complaint Room Screening Sheet, Harvis Decl., Exh. 31 (showing Essig recovered funds); *see also* Cordero Dep., Harvis Decl., Exh. 1, p. p. 130, ln. 18-25 (explaining Rubin confiscated money); *also compare* Complaint Room Screening Sheet, Harvis Decl., Exh. 31, and NYPD Property Clerk Invoice, Harvis Decl., Exh. 15 (showing $584 recovered from plaintiff) *with* Command Log (reflecting $596 in funds plaintiff had $596).

Plaintiff was charged with Criminal Possession of a Controlled Substance in the Third Degree, a Class B Felony. *See* Criminal Complaint annexed to Harvis Decl. as Exhibit 11. Plaintiff was never indicted, and the charges were dismissed approximately four months later, on the District Attorney's motion. *See* Certificate of Disposition annexed to Harvis Decl. as Exhibit 12.

The charges against the alleged buyer in the drug transaction, Matthew Niños, were also later sealed. *See* Email from A. Booth to G. Harvis, dated February 9, 2017, annexed to Harvis Decl. as Exhibit 28.

Notably, the officers claim they stopped Mr. Niños immediately after the transaction and that Niños dropped two glassine envelopes to the ground upon sight of the police. *See* Criminal Complaint, Harvis Decl., Exh. 11. Yet the glassines the officers vouchered were all but empty, containing only residue. See Drug Photograph, annexed to Harvis Decl. as Exhibit 13. Laboratory testing confirms that the bags' contents had an aggregate weight of approximately 1/10th of one gram. See NYPD Controlled Substance Analysis, Harvis Decl., Exh. 14. The officers are also unable to explain the chain of custody as to the drugs, which were never field tested. *See* Complaint Room Screening Sheet, annexed to Harvis Decl. as Exh. 31.

## B.    The Falsification of Overtime Requests by Defendants Hugasian and Essig

Venality may help explain the officers' conduct in this case. Discovery has revealed that two of the defendants, Hugo Hugasian and John Essig, falsified overtime records related to their work on the SNEU team on October 24, 2014. More broadly, the 83rd Precinct SNEU squad appears to have been engaged in systematic overtime abuses.[7]

---

[7] Between them, members of this SNEU team requested compensation for at least twenty-seven hours and forty minutes of overtime following what appears to have been about four hours of work arresting

Defendant Hugo Hugasian requested eight hours and fifty minutes of cash overtime for his work processing the Cordero and Niños arrests. *See* Overtime Worksheet and Overtime Analysis, Harvis Decl., Exh. 17. Scheduled to work from 7:00 a.m. to 3:35 p.m., Hugasian wrote in his memo book that he worked until 12:15 a.m., providing no information about his activities after plaintiff's arrest at 1:40 p.m. *See* Hugasian memo book, Harvis Decl., Exh. 16. In his overtime request, however, which is replete with error, Hugasian states that he worked until 12:25 a.m., a ten-minute discrepancy. *See* Overtime Worksheet and Overtime Analysis, Harvis Decl., Exh. 17.

At his deposition, Hugasian testified, consistent with his written compensation request, that he incurred the overtime processing the Niños and Cordero arrests and "waiting for the ADA" regarding those arrests. *See* Hugasian Dep., Harvis Decl., Exh. 10, p. 328, ln. 8 through p. 332, ln. 13; *see also* Overtime Worksheet and Overtime Analysis, Harvis Decl., Exh. 17. However, official NYPD documents reflect that Hugasian signed the criminal complaint and was interviewed and "released" by the District Attorney by 10:10 p.m. on October 24, 2014 (at the latest). *See* OLPA, Harvis

---

people on October 24, 2014. *See* Overtime Worksheets annexed to Harvis Decl. as Exhibit 17. Hugasian and Essig's requests alone account for sixteen hours and forty-five minutes of that time. *Id.* The SNEU team also disregarded Patrol Guide rules limiting SNEU overtime by allowing Officer Lynette Reyes to obtain overtime payments for administrative work that was duplicative of the arrest processing for which Hugasian also received compensation. *Id.*; *see also* Patrol Guide § 212-116, SNEU Guidelines; *see also* Omnioform Complaint Report, Harvis Decl., Exh. 22.

Decl., Exh. 19. Thus, Hugasian added two hours of non-compensable time to his overtime request, and then further inflated the request by adding ten minutes to the shift end time noted in his memo book.[8] *See* OLPA, annexed to Harvis Decl. as Exhibit 19.

Indeed, while Hugasian sought (and was paid) overtime compensation for processing the Cordero and Niños arrests until 12:25 a.m., both Cordero and Niños left the precinct at 5:40 p.m. and Mr. Cordero was arraigned and released from Brooklyn Criminal Court by 12:01 a.m. *See* Command Log, Harvis Decl., Exh. 20 and OLPA, Harvis Decl., Exh. 19.

Strikingly similar discrepancies appear in the documents created by defendant Essig. According to his memo book, Essig made two arrests at 11:20 a.m. *See* Essig memo book annexed to Harvis Decl. as Exhibit 6. His memo book indicates that he faxed the paperwork for the arrests to the District Attorney by 4:30 p.m., ordinarily the final task of arrest processing. *Id*. Essig remained on the clock though, with his memo book reflecting vague administrative assignments through 11:15 p.m. *Id*. Essig submitted an overtime request the same day, certifying that he had worked on arrest

---

[8] This appears to be intentional misconduct rather than a mistake, since both Hugasian's memo book and his overtime paperwork were completed the same day, October 25, 2014. See Hugasian memo book, Harvis Decl., Exh. 16 and Hugasian Overtime Worksheet and Overtime Analysis Worksheet, Harvis Decl., Exh. 17. The possibility of mistake is further diminished by the fact that Essig made a similar "error," discussed *infra*, in inflating his overtime request. *See* Essig Overtime Worksheet and Overtime Analysis Worksheet, Harvis Decl., Exh. 17.

processing until 11:25 p.m., a discrepancy of at least fifteen minutes and apparently as much six hours and fifty-five minutes. *See* Essig Overtime Worksheet, Harvis Decl., Exh. 17. On the related "Overtime Analysis Worksheet," Essig stated that his arrests had taken place at 3:35 p.m. (his scheduled end of shift time), when they had actually taken place over four hours earlier at 11:20 a.m. *Id*. At his deposition, Essig testified that this was standard operating procedure. *See* Essig Dep. II, annexed to Harvis Decl. as Exhibit 7, p. 39, ln. 4-10.

## THE SUMMARY JUDGMENT STANDARD

It is well settled that summary judgment under FED. R. CIV. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" within the meaning of FED. R. CIV. P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable

inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir. 2004) (quotation omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)). "[I]f 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

## ARGUMENT

## POINT I

## DEFENDANTS' MOTION SHOULD BE DENIED AS UNTIMELY

"The failure to meet a deadline established pursuant to Fed. R. Civ. P. 16(b)(2) is…a proper basis for denying a summary judgment motion." *Kinberg v. Colorforms*, 89-CV-1156 (PKL), 1991 WL 285621, *4 (S.D.N.Y. Dec. 31, 1991) (collecting cases).

Defendants have repeatedly disregarded Court deadlines in this matter, delaying

the proceedings. *See, e.g.,* DE #39 (defendants' reply due on April 15, 2016 but filed on April 18, 2016); DE #43-44 (discussing defendants' belated request for *nunc pro tunc* extension of lapsed Court-ordered production deadline); Minute Entry dated August 8, 2016 (ordering defendants to file status report by August 12, 2016; report not filed according to docket sheet); DE #66 (after Court "reluctantly" grants extension request, defendants disregard November 3, 2016 filing deadline and file opposition on November 4, 2016).

Regarding the instant motion, the briefing schedule originally set at a telephone conference held on May 19, 2017 called for defendants' motion to be filed by July 21, 2017. DE #92. On the due date, over plaintiff's objection, defendants sought to adjourn the schedule 46 days. *See* DE #95-96. By order dated July 24, 2017, the Court granted defendants' request in part, extending their filing deadline to August 4, 2017. The Court issued an order on July 25, 2017 affirming the August 4th deadline. DE #98 ("No further extension will be granted.").

Without seeking any extension of the Court's order (or contacting plaintiff), defendants allowed the August 4th deadline to expire and first began filing their motion papers on the ECF system at 2:28 p.m. on August 7, 2017. *See* DE #101.

Given the defendants' conduct to this point, which includes repeated violation of Court deadlines and conduct justifying the imposition of discovery sanctions

plaintiff respectfully submits that the Court should deny defendants' motion as untimely.

## POINT II

## DEFENDANTS HAVE MISTREATED THE RECORD

As the Second Circuit explained in *Holtz v. Rockefeller & Co.*, "[t]he purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." 258 F.3d 62, 74 (2d Cir. 2001).

Here, defendants omit material facts in genuine dispute that would defeat their motion and offer citations that do not support the stated proposition and facts that are controverted by other competent evidence. *See* Plaintiff's Counter 56.1 Statement, *generally.*

For example, in their effort to show that Essig and Rubin were not "personally involved" in plaintiff's stop or arrest, defendants ignore plaintiff's testimony that Rubin and Essig conducted a custodial interrogation of him inside the police vehicle, without administering *Miranda* warnings, that plaintiff denied involvement, and that Essig admitted that he did not believe plaintiff was guilty. *See* Cordero Dep., Harvis Decl., Exh. 1, p. 120, ln. 20 through p. 121, ln. 3. Given the admitted confusion of the officers concerning the identity of the perpetrator and the credibility issues of the complainant

(Hugasian), a reasonable jury crediting plaintiff's allegations could easily conclude that Essig and Rubin were liable on plaintiff's unlawful stop and false arrest claims. Similarly, defendants rely on plaintiff's statements to argue that Essig was not present for the strip search, and omit that Essig himself testified to being present. *See* Essig I Dep., Harvis Decl., Exh. 29, p. 235, ln. 5-7, 17-20, p. 236, ln. 6-11, 22, p. 237 ln. 19 through p. 238, ln. 3, 8-10.

The same holds true for Moran. In their misguided effort to obtain his dismissal from the case, defendants rely solely on Moran's self-serving testimony, and omit evidence that broadly contradicts his assertion, including the Patrol Guide, arrest report, complaint report, command log, and Moran's own memo book. *See* n.2, *supra.*

"[W]here, as here, the cited materials…do not support the purported undisputed facts in a party's Rule 56.1 statement, those assertions must be disregarded and the court may review the record independently." *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, 07-CV-8828 (ER), 2013 WL 3929630, *1 (S.D.N.Y. July 30, 2013) (citing *Holtz*, 258 F.3d at 74 and *Costello v. N.Y. State Nurses Ass'n*, 783 F.Supp.2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding party's Rule 56.1 statement due to failure to refer to evidence in the record)).

Plaintiff respectfully requests that the Court thus disregard those purportedly undisputed facts offered by defendants that lack support in the record, review the record independently and deny defendants' motion.

## POINT III

### RUBIN AND ESSIG STOPPED, INTERROGATED AND FALSELY ARRESTED PLAINTIFF

Defendants argue that plaintiff cannot establish he was stopped and that, even if he was stopped in the absence of reasonable suspicion, Rubin and Essig have no liability. Def. Mem. at Point I-II. This is a failing argument.

According to plaintiff, Essig and Rubin investigated the false allegations of a complainant, Hugo Hugasian, who is unworthy of belief. *See* Confidential Material; *See Oliveria v. Mayer*, 23 F.3d 642 (2d Cir. 1994); *Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003); *Bullard v. City of New York*, 240 F. Supp. 2d 292 (S.D.N.Y. 2003). Based on whatever Hugasian said to them, which is unknown on this record, the officers realized in 20 seconds that they did not know who in the store Hugasian was talking about. *See* Surveillance Video, Harvis Decl., Exh. 3. Without reviewing immediately available evidence, including surveillance video, or interviewing any witnesses at the scene, the officers then spoke to Hugasian again, and ultimately took Mr. Cordero into custody. *Id*. In the police car, Essig and Rubin interrogated Mr. Cordero about the crime without administering *Miranda* warnings and, when Mr. Cordero denied his

-15-

involvement, Essig admitted that probable cause was lacking. *See* Cordero Dep., Harvis Decl., Exh. 1, p. 120, ln. 20 through p. 121, ln. 3.

Plaintiff respectfully submits that a reasonable jury could conclude on this record that seizure of plaintiff was unjustified in its inception and hence unlawful, whether it is characterized as a stop or an arrest, and that Essig and Rubin are liable on this record. *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990).

## POINT IV

### ESSIG CONCEDES PERSONAL INVOLVEMENT IN PLAINTIFF'S ILLEGAL STRIP SEARCH

Relying solely on plaintiff's testimony that one officer conducted the strip search, and ignoring Essig's own testimony that he was present, defendants argue that "there is no evidence to support a finding that Officer Essig failed to intervene to prevent plaintiff's strip-search." Def. Memo at Point III, p. 10. This is incorrect.

"Summary judgment is inappropriate when there are genuine disputes of material fact concerning what the officers who failed to intervene observed regarding the other officers' alleged violations of plaintiffs' constitutional rights." *Usavage v. Port Auth. of N.Y. & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (quoting *Matthews v. City of New York,* 889 F.Supp.2d 418, 442–43 (E.D.N.Y. 2012) (quotation marks omitted).

Here, according to defendant Essig, both he and defendant Rubin were present for the search, and Essig does not recall whether Hector Cordero was clothed. *See* Essig Dep. I, annexed to Harvis Decl. as Exhibit 29, p. 235 through ln. 5-7, 17-20 through p. 236, ln. 6-11, 22 through p. 237, ln. 19 through p. 238, ln. 3, 8-10 (Q: So where were you when Rubin was searching Cordero? A: I was standing close by Rubin…Q: Were you looking in Rubin's direction? A: I'm sure I was…I observed that Officer Rubin was searching [Cordero]. Q: Did you see Officer Rubin inside the cell with Hector Cordero? A: Yes, Officer Rubin was with the prisoner inside the cell. Q: Did you see that? A: I saw that, yes…Q: Did Hector Cordero have clothes on? A: I don't recall.).

If a jury concludes Essig was present for and observed the strip search, as his testimony suggests, and that he knew it was unlawful (as suggested by his admission in the police car) but failed to intervene, Essig may properly be held liable on plaintiff's unlawful search claim. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). Accordingly, summary judgment is unavailable.

<u>POINT V</u>

<u>THE EVIDENCE SUPPORTS *MONELL* LIABILITY</u>

Defendants claim that plaintiff has failed to establish a claim under 42 U.S.C. § 1983 for municipal liability because he has failed to show any defect in the City's hiring

practices or the existence of a quota policy. Def. Mem. at Point IV. This is not true.

In his Complaint, plaintiff does not baldly assert a custom or policy; rather plaintiff identifies specific policies, usages, practices, procedures and rules of the City of New York and its police department, including, but not limited to: hiring officers morally and intellectually unfit to perform their duties in accordance with the Constitution and maintaining a *de facto* quota policy that encourages false arrests. *See* Complaint at ¶¶ 54-55.

These allegations have been broadly substantiated in discovery. *See* Hugasian Confidential Disciplinary Records; Statement of Facts, *supra* (discussing overtime abuses, deficiencies in SNEU supervision and Patrol Guide violations).

Additionally, plaintiff claims that the existence of the unconstitutional customs and policies of the City of New York and its police department can be inferred from repeated occurrences of similar wrongful conduct. Based on the evidence in the record as outlined herein and in plaintiff's Rule 56.1 Counterstatement, plaintiff respectfully submits that this case presents *Monell* issues similar to *Colon v. City of New York*, a case that the resulted in a judgment against the City of New York totaling $432,337.90. *See* 09-CV-8, 09-CV-9 (JBW), 2009 WL 4263362 (E.D.N.Y. Nov. 25, 2009) and DE #174,

As in *Colon*, the record here supports the conclusion that the City caused

plaintiff's arrest by virtue of the municipality's customs, policies, usages, practices, procedures, and rules, including:

> (a) wrongfully arresting minority individuals on the pretext that they were involved in drug transactions;
> (b) manufacturing evidence against individuals allegedly involved in drug transactions;
> …
> (d) unlawfully strip-searching pre-arraignment detainees in the absence of any reasonable suspicion that said individuals were concealing weapons or contraband; and
> (e) arresting innocent persons in order to meet "productivity goals" (i.e. arrest quotas).

*Id.* at *1. Plaintiff respectfully submits that there are hundreds of other lawsuits filed every year against the NYPD containing similar allegations.

In *City of Canton v. Harris*, 489 U.S. 378, the Supreme Court held that a municipal policy or custom may include a failure to provide adequate training if the deficiency "evidences a deliberate indifference to the rights of its inhabitants." *Id.* at 388. The Court of Appeals addressed the issue of inadequate training as deliberate indifference in *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), which is a case similar to the case at bar.

James Walker was convicted because police officers and prosecutors covered up exculpatory evidence and committed perjury in order to ensure Walker's conviction despite their knowledge of his probable innocence. Walker spent 19 years in prison

before being released. He brought an action against the City, pursuant to § 1983, for its alleged deliberate indifference to his constitutional rights, claiming that, in addition to other obligations: 1) the District Attorney's office failed to adequately train and supervise its assistants with respect to the obligation to turn over exculpatory evidence and to avoid the introduction of perjured evidence, and 2) the police department had an obligation to, but failed to, adequately train and supervise officers as to the proper handling of exculpatory information and the duty to provide (and seek) truthful and accurate testimony.

Walker claimed that the police department should train and supervise officers not to commit perjury or aid in the prosecution of the innocent. There is factual similarity between the Walker case and the case at bar. Here, plaintiff allege that a team of officers, then members of the New York City Police Department, fabricated a narcotics sale and claimed that plaintiff participated in the commission of said sale of drugs to non-party Matthew Niños.

According to Mr. Cordero there was no such sale; the facts and circumstances of plaintiff's involvement in the alleged sale was completely fabricated, or, more likely, there was no sale, as plaintiff never left his position behind the counter. Hugasian, Essig and Rubin, under the supervision of Moran, allowed Mr. Cordero to be arrested and handcuffed, brought to the precinct and strip-searched.

The officers then saw to it that the Kings County District Attorney's Office prosecuted plaintiff for the fabricated drug sale. Defendant Hugasian prepared official Police Department paperwork describing the fabricated narcotics sale and then signed and swore to the truth of an affidavit setting forth the facts of the fabricated narcotics sale.

In *Walker*, the plaintiff contended that his allegations met the "deliberate indifference" threshold set by *City of Canton v. Harris*, that is, city policymakers know to a moral certainty that police officers will be presented with opportunities to commit perjury or proceed against the innocent. A failure by police officers to resist these opportunities will almost certainly result in deprivations of constitutional rights. Walker contended that, just as municipalities have a duty to train officers in the constitutional limits on the use of force in apprehending criminals, so too must municipalities train and supervise their officers with respect to the obligation not to commit perjury or assist in the prosecution of the innocent. *Id.*

Plaintiff here believes that a reasonable jury could conclude that the evidence here demonstrates a similar "deliberate indifference" to the one in Walker. From the facts presented in the Walker case, the Court of Appeals held that three requirements that must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens. First, the plaintiff must

show that a policymaker knows "to a moral certainty" that employees will confront a given situation. *Id.* at 297. Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. A choice might also be difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice. *Id.* at 297. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. *Id.* at 298, citing *City of Canton v. Harris*, 489 U.S. at 390.

The plaintiff here can show that the City knows its police officers are faced almost daily with situations in which they will make an arrest and have to present the circumstances of the arrest to the District Attorney's Office. The plaintiff can show that police officers routinely are confronted with situations in which they have an opportunity to embellish, exaggerate or even fabricate facts because, ultimately, it will be their word against the word of a criminal defendant. Thus, these are not "rare or unforeseen events."

Furthermore, the plaintiff can show that these situations would occur far less frequently if the Police Department did not encourage its officers to make more arrests,

but rather properly investigated claims of misconduct, trained its officers in ethics, morals and the repercussions of perjury and punished its officers for such wrongdoing.

Finally, the plaintiff can show that the wrong choice by a police officer will frequently cause the deprivation of a citizen's constitutional rights. In Walker, the district court rejected the plaintiff's claims on the theory that a police officer's obligations to not commit or suborn perjury or prosecute the innocent are obvious. The Court of Appeals, however, reversed and remanded the case, reasoning that while Walker had not expressly alleged a history of police perjury, it did not appear "beyond doubt" that Walker cannot prove this "set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York*, 974 F.2d at 300, citing *Ricciuti v. New York City Transit Authority*, 941 F.2d 119.

The Court held that Walker should be allowed to pursue discovery in order to determine whether there was a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury) or a pattern of police misconduct sufficient to require the police department to train and supervise police officers to assure they tell the truth. *Id.* at 300. The plaintiff believes that the record here supports liability under *Walker*, as it suggests a pattern of misconduct sufficient to turn such apparently reasonable reliance into deliberate indifference. Thus, liability may fairly be laid at the City's doorstep. The plaintiff, therefore, asks the Court not to dismiss his *Monell* claims, and to allow the

-23-

claims to go to trial.

## POINT VI

## THE EVIDENCE SUPPORTS SUPERVISORY LIABILITY

In the Second Circuit, in a claim brought under 28 U.S.C. § 1983, the personal involvement of supervisory officials may be established by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [citizens] by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

Here, plaintiff respectfully submits that a reasonable jury considering the evidence presented could conclude that a number of the *Colon* theories of supervisory liability apply against Moran, including direct involvement, gross negligence and deliberate indifference. To the extent the Court concludes that plaintiff's pleadings insufficiently articulate a supervisory liability claim against Moran, plaintiff respectfully requests that he be granted leave to conform his pleadings to the proof, pursuant to Fed. R. Civ. P. 15(b).

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff respectfully requests that the Court deny defendants' motion in its entirety, and grant such other and further relief as the Court deems just and proper.

Dated:        August 21, 2017
              New York, New York

<div align="center" style="margin-left:40%">

HARVIS & FETT LLP

_____
Gabriel P. Harvis
Baree N. Fett
305 Broadway, 14th Floor
New York, New York 10007
(212) 323-6880
gharvis@civilrights.nyc

*Attorneys for plaintiff*

</div>