UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HECTOR CORDERO, | **MEMORANDUM AND ORDER** |
| Plaintiff, | 15-CV-3436 |
| – against – | |
| THE CITY OF NEW YORK, Police Officer HUGO HUGASIAN, Shield #10228; Lieutenant CHRISTOPHER MORAN; Police Officer PETER RUBIN, Shield # 00934; and Police Officer JOHN ESSIG, Shield #08667, individually and in their official capacity as New York City Police Officers, | |
| Defendants. | |

**Parties**

Hector Cordero

**Appearances**

**Gabriel Paul Harvis**
**Baree N Fett**
Harvis & Fett LLP
305 Broadway
14th floor
New York, NY 10007
212-323-6880
Fax: 212-323-6881
Email: gharvis@civilrights.nyc

The City of New York
Police Officer Hugo Hugasian,
Lieutenant Christopher Moran,
Police Officer Peter Rubin, Police
Officer John Essig.

**Amatullah Khaliha Booth**
**Erica Michelle Haber**
Office of the Corporation Counsel,
NYC Law Department
Office of the General Council
100 Church Street
Special Federal Litigation Division
New York, NY 10007
212-356-3534
Fax: 212-356-3509
Email: abooth@law.nyc.gov

**JACK B. WEINSTEIN, Senior United States District Judge:**

Table of Contents

I. Introduction .................................................................................................................. 2
    A. Alleged Lying by Police Officers ......................................................................... 2
    B. Charges .............................................................................................................. 4
    C. Bifurcation ......................................................................................................... 5
II. Facts ......................................................................................................................... 6
    A. Individuals ......................................................................................................... 6
    B. Events Leading to Arrest .................................................................................... 7
    C. Arrest of Hector Cordero .................................................................................... 8
    D. Search ................................................................................................................ 9
    E. Criminal Charges ............................................................................................... 9
    F. Overtime ............................................................................................................ 9
    G. Officer Hugasian's Disciplinary and Court History ............................................. 10
    H. Plaintiff's Claims and Defendants' Motion for Summary Judgment ..................... 11
III. Law ......................................................................................................................... 11
    A. Summary Judgment .......................................................................................... 11
    B. Unlawful Stop and Search ................................................................................. 12
    C. False Arrest ...................................................................................................... 13
    D. Unlawful Strip Search ....................................................................................... 14
    E. *Monell* Claims ................................................................................................ 16
    F. Supervisory Liability ......................................................................................... 18
IV. Application of Law to Facts ....................................................................................... 19
    A. Unlawful Stop and Search ................................................................................. 19
    B. False Arrest ...................................................................................................... 19
    C. Failure to Intervene in an Unlawful Search ........................................................ 20
    D. *Monell* Claim for Overtime and False Arrest .................................................. 20
    E. Supervisory Liability ......................................................................................... 21
V. Conclusion ................................................................................................................ 21

I. Introduction

    A. Alleged Lying by Police Officers

        Plaintiff alleges that street sale drug charges against him were trumped up by a group of

New York Police Department ("NYPD") officers, because they wanted to make an arrest near

the end of their tour of duty in order to obtain overtime for completing the attendant paperwork.

He contends that there was no factual basis for his arrest.

Such cases are becoming increasingly difficult to try fairly. Jurors are ever more aware of stories in the media reporting police officers lying to justify false arrests and to convict criminal defendants.[1]

New York's police department is widely admired for its overall effectiveness; most jurors find officers more credible than persons accused of crimes. But, as one commentator discussing police officer veracity indicates: some experts on police practice treat lying by police at trials and in their paperwork as the "norm," "commonplace," or "routine." Michelle Alexander, *Why Police Lie Under Oath*, N.Y. Times, Feb. 2, 2013 ("In 2011, [in New York City] hundreds of drug cases were dismissed after several police officers were accused of mishandling evidence. That year, Justice Gustin L. Reichbach of the State Supreme Court in Brooklyn condemned a widespread culture of lying and corruption in the department's drug enforcement units . . . 'this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'").

A NYPD official took the position that the problem of perjury is not pervasive within the department, and that the tendency of police officers to fabricate testimony is no greater than that of non-police witnesses. Joseph Goldstein, *Scrutiny of Decorated Detective Raises Specter of Lying as Routine*, N.Y. Times, Oct. 11, 2017 ("Lawrence Byrne, the [police] department's top legal official" stated that the department does not have "'a widespread perjury problem . . . I don't believe—although no one has done an empirical study—that the incidence of perjury among police officers is any higher or lower than the incidence of perjury among other categories of witnesses, which includes civilian witnesses, complainants, expert witnesses.'"). This statement misses the point. Police officers, unlike civilians, have the power to terminate constitutionally protected liberty; with this power comes great responsibility, as well as the need

for appropriate oversight.  *See, e.g., N.Y.P.D. Officers Are Charged with Lying About a Suspect*, Feb. 16, 2017 ("Cyrus R. Vance Jr., the Manhattan district attorney, said the charges against the detectives were a 'gross violation of their training, N.Y.P.D. protocol and the law. When members of law enforcement commit misconduct,' he added, 'they threaten the credibility of our work and the safety of the citizens whom we are sworn to protect.'").

In the present case the court will allow the plaintiff to proceed against the City of New York on *Monell* grounds that allege the failure to take reasonable steps to control lying by police officers is a policy of the NYPD.  *See Monell v. Department of Social Services,* 436 U.S. 658 (1978).  His theory is that the police department has long been aware of a wide-spread practice of false arrests at the end of tours of duty in order to obtain overtime and that it has failed to sufficiently address this practice.[2]  Plaintiff argues that the city's policy is not to track or adequately discipline policemen for testifying falsely.  And that it has failed to supervise or properly discipline police officers with a record of being unsuccessful defendants in Title 42 U.S. Code Section 1983 cases because they fabricated evidence.

B. Charges

Before the court are four officers from a special narcotics unit who together received over twenty hours of overtime pay for processing two arrests, including that of the plaintiff for an alleged street drug sale.  The officer who observed the purported sale, Hugo Hugasian, has a disciplinary record for falsification of overtime as well as a number of prior lawsuits against him claiming false arrest.  The officers are personally being sued for: (1) unlawful stop and search; (2) false arrest; (3) malicious prosecution; (4) denial of right to a fair trial; (5) unlawful strip-search; (6) failure to intervene; and (7) supervisory liability.

4

The city is being sued on the theory that its overtime policy and policy on lying by its officers encouraged their unlawful action.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[A] municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation.")

One difficulty in administering such a case if it goes to a joint trial on individual and *Monell* claims is that the City of New York will be prejudiced in defending its liability by evidence about the individual officers' lack of veracity.  The individual defendants will suffer prejudice by the introduction of wide-spread municipal misconduct—lying by police officers— needed to prove a municipal policy.  Plaintiff may be inhibited by exclusion of relevant evidence prejudicial to the defendants'.  *See, e.g.*, Fed. R. Civ. P. Rule 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice.").

C. Bifurcation

To avoid these evidentiary problems, the court has ordered a bifurcated trial.  The first phase will be against the officer defendants, the second phase on the *Monell* issue will only need to go forward if the jury finds against the individual defendants in the first phase.  *Amato v. City of Saratoga Springs, N.Y.,* 170 F.3d 311, 315 (2d Cir. 1999) ("[B]ifurcation may be appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue or where one party will be prejudiced by evidence presented against another party.").

The city, at a hearing on the defendants' summary judgment motion, has in effect admitted liability on the *Monell* claim if an individual defendant is found liable by stating: "If plaintiff wins [on the individual claim], we will consent.  You can throw the City in the judgment and we will throw a dollar to it and we will avoid the second trial."  Hr'g Tr. 34:15-17.

5

The dollar damages suggested somewhat contemptuously by the city's counsel is not a convincing argument for rejecting a trial of the *Monell* phase. Even if the city's damages, whether or not the *Monell* phase goes forward, will be the same, a finding by a petty jury that a municipal policy encouraged widespread police officer misconduct can be significant. It may indicate the need for more careful tracking of individual police officer's litigation history and a more effective discipline policy to avoid repeated lying by a number of officers. *Amato,* 170 F.3d at 317 ("[W]hile the monetary value of a nominal damage award must, by definition, be negligible, its value can be of great significance to the litigant and to society.").

The following claims will be tried in phase I: (1) false arrest against Officer Hugasian; (2) malicious prosecution against Officer Hugasian; (3) denial of a right to a fair trial against Officer Hugasian; (4) unlawful strip search against Officer Rubin; (5) failure to intervene, by Officer Essig, in the alleged strip-search; and (6) supervisory liability against Lieutenant Moran.

In phase II *Monell* claims against the City of New York will be tried, if any of individual claims 1 to 6 are found proven by the jury.

II. Facts

Evidence adduced would permit findings by the jury of the following facts:

A. Individuals

Hector Cordero is a 58 year-old Hispanic male, who is employed as a cashier at J&C Mini-Market ("Mini-Market") in Brooklyn. *See* Letter from F. Tineo, ECF No. 111, Exh. 2, Aug. 22, 2017 ("Tineo Letter"). Mr. Cordero has no criminal record; he served as a police officer in the Dominican Republic before he immigrated to the United States. Cordero Dep. A. 18:1-25, ECF No. 102, Exh. G, Aug. 7, 2017 ("Cordero Dep. A."). Fausto Tineo is the owner of J&C Mini-Market. Tineo Letter.

6

Officers Hugo Hugasian, Peter Rubin, and John Essig were part of a NYPD Street
Narcotics Enforcement Unit ("SNEU"), stationed at the 83rd precinct, and supervised by
Lieutenant Christopher Moran.  *See* Moran Dep. B., ECF No. 111, Exh. 4, Aug. 22, 2017
("Moran Dep. B"); *see also* SNEU TAC Plan, ECF no. 111, Exh. 5, Aug. 22, 2017 ("SNEU
Plan").

B. Events Leading to Arrest

On October 24, 2014 at approximately 1 p.m., Officer Hugasian was alone in a vehicle
conducting undercover narcotics observations near the corner of Irving Avenue and Jefferson
Street, in Brooklyn.  Def.'s Rule 56.1 Statement of Undisputed Facts at ¶ 7, ECF No. 103, Aug.
7, 2017 ("Def.'s 56.1").  He observed a Hispanic male, later determined to be Matthew Ninos,
approach J&C Mini-Market holding his cellphone to his ear.  *Id*. at ¶ 10.

An individual exited the Mini-Market, walked to Mr. Ninos, and, according to Officer
Hugasian, handed him "what appeared to be two little zips or bags," in exchange for currency.
Hugasian Dep. 184:17-25, ECF No. 102, Exh. D, Aug. 7, 2017 ("Hugasian Dep.").  Officer
Hugasian "immediately went over the radio and transmitted the description of the buyer . . . to
the apprehension cars"; soon after he radioed that "the seller [had] entered the bodega."  *Id.*
185:15-25 (Officer Hugasian testified that he could not remember the description of the seller he
radioed).

Lieutenant Moran and Officer Palminteri responded to the scene and observed a Hispanic
male, Mr. Ninos, with what appeared to be drugs in his hand.  Moran Dep. A 141:6-11, ECF No.
102, Exh. C, Aug. 7, 2017 ("Moran Dep. A").  At 1:20 p.m. the officers arrested Mr. Ninos.  *Id.*
They recovered two bags containing a total of .138 grams of cocaine.  *Id.; see also* NYPD
Controlled Substance Analysis, ECF No. 111, Exh. 14, Aug. 22, 2017 ("Lab Report");

Complaint Room Screening Sheet, ECF No. 111, Exh. 31, Aug. 22, 2017 ("Compl. Screening

Sheet").  Mr. Ninos pled guilty to possession of "drugs"; in his plea allocution he did not testify

to any facts about a drug transaction.  Hr'g Tr. 20:17-22.  The city has been unable to locate Mr.

Ninos; he will apparently not testify at trial.  *Id.* 16:5-8.

   C. Arrest of Hector Cordero

        Officers Rubin and Essig also received the radio reports from Officer Hugasian; they

responded to the corner of Irving and Jefferson.  Def.'s 56.1 at ¶ 16.  These officers entered the

Mini-Market, but quickly left when they could not identify the suspect.  *Id*. at ¶ 17 (Officers

Rubin and Essig did not recall, at their depositions, the description of the seller given by Officer

Hugasian).

        The two officers radioed Officer Hugasian and asked him to return to the scene and

identify the seller because "two people in the bodega matched the description."  *Id*.   Officer

Hugasian entered the Mini-Market, purchased a bottle of water, and, after leaving, informed

Officer Rubin that the seller was standing behind the counter.  *Id*. at ¶ 18.

        Officer Rubin then re-entered the bodega and asked the owner of the store, Fausto Tineo,

to step outside to speak privately.  Rubin Dep. 147:15-18, ECF No. 102, Exh. C, Aug. 7, 2017.

The officer informed Mr. Tineo that the "gentleman behind the counter [Mr. Cordero] . . . was

going to have to come with us."  *Id.* 149:9-16.

        At 1:40 p.m. Mr. Cordero, after being told by Mr. Tineo that the police needed to speak

with him, stepped outside of the Mini-Market and was handcuffed by Officers Rubin and Essig

and placed in a police vehicle.  Def.'s 56.1 at ¶ 20; Compl. Screening Sheet.  No drugs or

paraphernalia were found on Mr. Cordero.  Def.'s 56.1 at ¶ 26.  He had almost $600 in United

States currency.  *Id.*  Mr. Cordero explained that he "usually . . . [carries] cash in [his] pocket for emergencies."  Cordero Dep. A. 124:20-25.

Mr. Cordero testified at his deposition that on the day of the incident he was working as a cashier, never left the store until he was asked to step outside and was arrested, and never made a drug sale.  Cordero Dep. A.  Fausto Tineo, who was working at the bodega on the day of the arrest, testified that Cordero could not have made a drug sale on the street, "because he was [in the store] the whole time."  Tineo Dep. 192:14-16, ECF No. 111, Exh. 25, Aug. 22, 2017.

D. Search

Mr. Cordero was transported to the 83rd precinct where "[h]e was placed [in] a cell and [] searched" by Officer Rubin.  Essig Dep. 234:6-12, ECF No. 102, Exh. E, Aug. 7, 2017 ("Essig Dep.").  Plaintiff alleges that he was strip-searched.  Cordero Dep. A. 124:10-14 ("I had to take all my clothes off, my socks, my shoes, my underwear.").

Officer Essig was present during the search "for Officer Rubin's safety"; he does not recall whether or not Mr. Cordero was clothed.  Essig Dep. 235:1-25.  No contraband was found.  Def.'s 56.1 at ¶ 26.

E. Criminal Charges

Mr. Cordero was charged with Criminal Possession of a Controlled Substance in the Third Degree, Criminal Sale of a Controlled Substance in the Third Degree, and Criminal Possession of a Controlled Substance in the Seventh Degree.  *See* Criminal Complaint, ECF No. No. 111, Exh. 11, Aug. 22, 2017.  He was never indicted; on March 4, 2015, all charges against him were dismissed by the District Attorney.  *See* Certificate of Disposition, ECF No. 111, Exh. 12, Aug. 22, 2017.

F. Overtime

The SNEU squad for the 83rd precinct received at least twenty-two hours of overtime for the arrest and processing of Hector Cordero and Matthew Ninos.  *See* Unscheduled Overtime Report, ECF No. 111, Exh. 17, Aug. 22, 2017 ("Overtime Report").  This number would likely be higher but it only includes the overtime for Officers Essig, Hugasian, Lynette Reyes, and Lieutenant Moran (at the time a sergeant).  *Id.*  Two of the officers, Hugasian and Essig together accounted for almost seventeen hours of overtime.  *Id.*

The overtime claims of Officers Hugasian and Essig are alleged to be inflated.  Each officer was scheduled to work from 7:00 a.m. to 3:35 p.m.  *Id.*  Police records indicate that Mr. Cordero and Mr. Ninos both left the 83rd precinct at 5:30 p.m., and were transported to the court house by a different officer.  *See* Command Log, ECF No. 111, Exh. 13, Aug. 22, 2017.  Officer Hugasian never met with the Assistant District Attorney assigned to this case, but he was interviewed by telephone by the assistant concerning Cordero's arrest.  Compl. Screening Sheet. Officer Hugasian signed the criminal complaint against Mr. Cordero at 8:10 p.m., faxed it to the Assistant District Attorney, and was "released" at that time.  *See* On-line Prisoner Arraignment, ECF No. 111, Exh. 19, Aug. 22, 2017.  Officer Hugasian claimed he worked until 12:25 a.m., Officer Essig claimed to have been on duty until 11:30 p.m.

G. Officer Hugasian's Disciplinary and Court History

In 2010 Officer Hugasian was suspended from duty for sixty days, docked thirty days of vacation time, stripped of his gun and his badge, required to pay $1203.74 in restitution, and placed on one-year probation for requesting overtime compensation for tours he did not perform. *See* Disciplinary Records Hugo Hugasian, ECF No. 111, Exh. 9, Aug. 22, 2017.  This evidence of discipline will not be introduced at trial.  The facts on which it was based may be; this question will be answered at an *in limine* hearing.  *See infra* Part V.

Officer Hugasian has been sued for false arrest at least three other times in federal court in the Eastern District of New York.  *See Foust v. N.Y.,* 15-CV-1837, ECF No. 1, Apr. 4, 2015 (suit also brought against Officer Essig, alleging false arrest for a drug sale that was later dismissed); *Davis v. N.Y.*, 15-CV-476, ECF. No. 11, Jul. 2, 2015 (alleging false arrest for illegally selling DVD's, as well as illegal strip search at the 83rd precinct); *Ramos v. N.Y.*, 17-CV-2373, ECF No. 10, Nov. 17, 2014.  Whether any of this background is admissible will be decided at an *in limine* hearing.

H. Plaintiff's Claims and Defendants' Motion for Summary Judgment

Hector Cordero sues the City of New York, Lieutenant Christopher Moran, and Police Officers Hugo Hugasian, Peter Rubin and John Essig (collectively "defendants"), alleging violations of Title 42 U.S. Code §§ 1983 and 1988, and of the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.  He claims: (1) unlawful stop and search; (2) false arrest; (3) malicious prosecution; (4) denial of right to a fair trial; (5) unlawful strip-search; (6) failure to intervene; (7) *Monell* against the City of New York; and (8) supervisory liability.

Defendants move for summary judgment on plaintiff's claims for: (1) unlawful stop and search; (2) false arrest as to Officers Essig and Rubin; (3) failure to intervene, by Officer Essig, in the unlawful strip-search; (4) a *Monell* violation against the City of New York; and (5) supervisory liability.

III. Law

A. Summary Judgment

Summary Judgment is appropriate when "viewing all evidence in the most favorable light to the non-moving party, no genuine issue of material fact exists."  *Stone v. Pamoja House*, 111

Fed. Appx. 624 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

("[S]ummary judgment will not lie if the . . . evidence is such that a reasonable jury could return

a verdict for the nonmoving party.").  The plaintiff must show "by affidavit or otherwise . . . that

there are specific factual issues that can only be resolved at trial." *Colon v. Coughlin*, 58 F.3d

865, 872 (2d Cir. 1995).

    B. Unlawful Stop and Search

       In *Terry v. Ohio*, the Supreme Court recognized that the government's interest in "crime

prevention," as well as officer and public safety allow officers in certain circumstances to

temporarily detain and frisk a person without probable cause to arrest.  392 U.S. 1, 22-25 (1968).

If a reasonable person would not feel free to leave or terminate an encounter it may ripen from a

*Terry* stop into an arrest.  *Florida v. Bostick*, 501 U.S. 429, 436 (1991).

       An investigative stop may not occur, only a "sudden arrest."  *Pinter v. City of New York*,

976 F. Supp. 2d 539, 564 (S.D.N.Y. 2013).

       To determine whether or not an arrest occurred, the Second Circuit considers:

> "the extent to which an individual's freedom of movement was restrained, and in
> particular such factors as the number of agents involved, whether the target of the
> stop was suspected of being armed, the duration of the stop, and the physical
> treatment of the suspect, including whether or not handcuffs were used."  (internal
> citations omitted).

*U.S. v. Perea*, 96 F.2d 633 (2d Cir. 1993).

       The plaintiff must suffer a harm independent of the general loss of liberty from their

arrest.  *See Faraone v. City of New York*, LEXIS 36316, at *4 (S.D.N.Y. Mar. 21, 2016); *see*

*Bryant v. Serebrenik*, LEXIS 25570, at *9 (E.D.N.Y. Feb. 23, 2017).

C. False Arrest

A plaintiff alleging false arrest must show "that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975). Probable cause is a "complete defense" to a claim of false arrest. *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985).

i. Fellow Officer Rule

The fellow officer rule, also known as the collective knowledge doctrine, allows one officer to make an arrest based on an instruction or information passed from one officer to another. *United States v. Hensley*, 469 U.S. 221, 233 (1985) (finding that an officer was justified in relying on a "wanted flyer" to stop a suspect, even if the officer making the stop lacked articulable facts of reasonable suspicion himself); *Martinez v. Simonetti*, 202 F.3d 625 (2d Cir. 2000) (an officer is permitted to rely on the observations or allegations of a "fellow officer" when determining whether there is probable cause to make an arrest).

The probable cause determination does not rest on whether the instructing officer's observations were accurate, but on whether the arresting officer was "reasonable in relying on those observations." *Bernard v. U.S.*, 25 F.3d 98 (1994); *see also U.S. v. Cutchin*, 956 F.2d 1216 (D.C. Cir. 1992) ("Within modern police departments, the officer who receives information justifying an individual's detention often is not the officer who acts on the information. Daily bulletins, computer messages and radio broadcasts alert officers in the field about those suspected of criminal activity.").

Where officers collectively possess enough evidence to give rise to probable cause, but have not actually communicated with each other, the collective knowledge doctrine may not apply. *See Colon*, 250 F.3d at 136 (citing *U.S. v. Shareef*, 100 F.3d 1491 (10th Cir. 1996).

ii.  Probable Cause

"Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). The probable cause analysis is limited to facts known by the "arresting officer at the time of the arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006).

Courts in this circuit have routinely found probable cause to arrest for a drug sale where an officer observed "objects or cash exchanged between suspects," and narcotics were recovered on an alleged buyer. *Mohr v. City of New York*, 2013 WL at *5 5988948, (S.D.N.Y. 2013); *Sam Brown*, 2002 WL 31102644 (E.D.N.Y. 2002).

D.  Unlawful Strip Search

To conduct a lawful strip search, the Fourth Amendment requires reasonable suspicion "that the arrestee is concealing weapons or other contraband based on the crime charged," or because of "the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986).  Reasonable suspicion is "stronger than a mere hunch, but something weaker than probable cause." *Varrone v. Bilotti,* 123 F.3d 75, 79 (2d Cir. 1997).

There is no bright line rule that all drug crimes, or crimes of any particular nature, support reasonable suspicion to strip search. *Hartline v. Gallo*, 546 F.3d 95 (2d Cir. 2008); *see*

14

*Murcia v. County of Orange*, 226 F. Supp. 2d 489, 494 (predicting the Second Circuit Court of Appeals would not find all strip searches to be reasonable solely because the crime charged was a felony).  Courts have found that an arrest for a narcotics offense may "give rise to an inference that the arrestee was secreting drugs on her person." *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 273 (S.D.N.Y. 2002) (citing *Campbell v. Fernandez*, 54 F. Supp. 2d 195 (S.D.N.Y. 1999).

"Being arrested for a narcotics-related crime [does not] automatically gives rise to reasonable suspicion that drugs are being carried in an arrestee's body cavities, so as to justify a strip search." *Sarnicola*, 229 F. Supp. 2d at 273; *See Foote v. Spiegel*, 118 F.3d 1416, 1425 (10th Cir. 1997) (finding a strip search, even in a case involving suspicion of driving under the influence of marijuana, "not justified in the absence of reasonable suspicion that the arrestee has [marijuana] hidden on his or her person"); *see also Swain v. Spinney*, 117 F.3d 1 (1st Cir. 1997) (dropping a bag of marijuana at the scene did not justify a strip search).

i. Personal Involvement

To be liable for damages under section 1983, a defendant must have been personally involved in the "alleged constitutional deprivation." *Wright v. Smith*, 21 F.3d 496, 502 (2d Cir. 1994) (quoting *Moffit v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991).  An officer is personally involved if he "failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003).

ii. Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

15

An officer will only be liable if "(1) [he] had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson,* 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008); *see also Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 129 (2d Cir. 1997) (finding qualified immunity precludes liability for failure to intercede unless the violation is of a "suspect's clearly established statutory or constitutional rights"). To grant summary judgment on qualified immunity grounds a "defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of arrest, could disagree about the legality" of the strip-search. *Ricciuti,* 124 F.3d at 129.

E. *Monell* Claims

A municipality may be liable under section 1983 if a plaintiff's constitutional or statutory rights are violated "by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Department of Social Services,* 436 U.S. 658 (1978). The Court of Appeals for the Second Circuit has established a two-prong test for finding liability under *Monell*: (1) the plaintiff must show a municipal policy or custom beyond a single bad act by an officer; (2) there must be a causal connection between the custom or policy and the plaintiff's loss of liberty. *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F. Supp. 2d 197, 204 (S.D.N.Y. 2013); *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985).

A custom or policy exists when a plaintiff can show either:

(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing

16

municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*K.D. ex rel. Duncan*, 921 F. Supp. 2d at 204.

i.      Wide Spread Acts

*Monell* liability will apply where "a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that" it has "tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007). Repeated and consistent conduct often indicate city involvement or acquiescence to a deprivation of liberty. *City of Canton,* 489 U.S. at 395 (holding that a municipality's "policy of inaction" may rise to "the functional equivalent of a decision by the city itself to violate the constitution"). Court's typically require documentary evidence of a "widespread practice." *Biewas v. City of New York*, 2017 WL 3524679, at *9 (S.D.N.Y. Aug. 15, 2017); *Bektic-Marrero v. Goldberg,* 850 F. Supp. 2d 418, 431 (S.D.N.Y. 2012) (finding a *Monell* claim sufficiently pled where the plaintiff could point to a report by the United States Department of Justice ("DOJ") concluding that the county defendant's "provision of medical care to inmates was constitutionally deficient in several respects," and "high-ranking prison officials were advised of the DOJ's preliminary findings"). Conclusory allegations that officers "engage in falsification to justify arrests for collateral objectives outside the ends of justice, including advancement on the job and/or to meet quotas and/or for overtime compensation" are insufficient without proof of custom or practice. *Biewas*, 2017 WL 3524679, at *9. Newspaper articles, reports, and other documents may provide sufficient documentary evidence for *Monell* liability. *Ricciuti*, 124 F.3d at 123 ("[T]he reports cited by plaintiffs would not be hearsay if they were offered for the purpose of proving

17

something other than the truth of the matters stated therein, such as whether appellees had

notice.").

       ii.     Failure to Train or Supervise

A city may be liable for failing to train and adequately supervise its employees.

*Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007).  A failure to supervise theory will

only exist when it amounts to deliberate indifference.  *City of Canton*, 489 U.S. at 389.

Deliberate indifference exists if a plaintiff can show:

> First . . . that a policymaker knows "to a moral certainty" that her employees will
> confront a given situation.  Second . . . that the situation either presents the
> employee with a difficult choice of the sort that training or supervision will make
> less difficult or that there is a history of employees mishandling the situation . . .
> Finally, the plaintiff must show that the wrong choice by the city employee will
> frequently cause the deprivation of a citizen's constitutional rights.

*Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992) (internal citations omitted).

    F. Supervisory Liability

Supervisory liability cannot be based solely on the "acts or omissions" of subordinates,

"the supervisor must be personally involved" and his or her actions must be causally related to

"the alleged deprivation."  *K.D. ex rel. Duncan*, 921 F. Supp. 2d at 206.

> Personal involvement of a supervisor may be shown by evidence that:
>
> (1) the defendant participated directly in the alleged constitutional violation, (2)
> the defendant, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of such a
> policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of [plaintiffs] by failing to act on information
> indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

IV. Application of Law to Facts

    A. Unlawful Stop and Search

        A "sudden arrest," based upon alleged police observance of a crime being committed, occurred in this case, not a *Terry* stop or frisk. *Pinter*, 976 F. Supp. 2d at 564. Even if a stop and frisk had occurred, the harm suffered would be indistinguishable from the harm caused by the alleged false arrest. *Faraone,* LEXIS 36316, at *11-12. Summary judgment is granted on all claims of unlawful stop and search.

    B. False Arrest

        While Officer Essig and Officer Rubin's recollection of the radio report they received from Officer Hugasian is vague, it is evident that they were told that the "seller entered the bodega," and later in person that the seller was the person standing behind the counter. Based on this information they entered the bodega and arrested Mr. Cordero. In the context of a special narcotics investigation, this was the equivalent of an instruction to arrest, which the officers were entitled to rely on. *Hensley*, 469 U.S. at 233; *Simonetti*, 202 F.3d 625.

        Summary judgment is granted on the plaintiff's false arrest claims against Officers Essig and Rubin. The plaintiff may proceed on his claim of false arrest against Officer Hugasian. *Johnson v. Burns*, F. Supp. 3d, 2017 WL 1755971 at *5 (S.D.N.Y. 2017) (finding an undercover officer who instructed another officer to make an arrest may be liable for false arrest if the arrest "was unsupported by probable cause"). Mr. Cordero claims he never left the bodega, and was never involved in any sale, giving rise to a disputed issue of material fact.

C. Failure to Intervene in an Unlawful Search

Defendants challenge plaintiff's claim that Officer Essig failed to intervene in an unconstitutional strip search. They do not move for summary judgment on the unlawful strip search claim against Officer Rubin, who is alleged to have performed the search.

The motion for summary judgment on this claim is denied. There is a genuine issue of material fact as to whether Officer Essig was present when Mr. Cordero was allegedly strip searched. He testified at his deposition that he was present during the search but did not recall if Mr. Cordero was clothed or not.

It is unclear whether the officers had reasonable suspicion to believe that Mr. Cordero was concealing contraband. *See Dell*, 804 F.2d at 802. During his arrest the police recovered roughly $600 in cash, but no drugs, no stash in the store, and no drug paraphernalia.

D. *Monell* Claim for Overtime and False Arrest

There is sufficient evidence for plaintiff to proceed on the grounds that: (1) New York city's overtime policy incentivizes officers to make false arrests; and (2) police malfeasance in general and as related to the overtime policy is inadequately monitored to prevent abuse.

A reasonable jury may find that this practice is not isolated to a few "bad" police officers, but is endemic, that NPYD officials are aware this pattern exists and that they have failed to intervene and properly supervise. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 564 (S.D.N.Y. 2013) (quoting *Cash v. County of Erie,* 654 F.3d 324, 334 (2d Cir. 2011) ("[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983.")).

E. Supervisory Liability

Viewed in a light most favorable to the plaintiff the claims of supervisory liability against Lieutenant Moran for false arrest may proceed to trial.  Lieutenant Moran supervised the investigation and arrest, and approved the overtime claims.  He also received overtime himself, arguably as a result of the arrest.  Ari Rosmarin, *The Phantom Defense: The Unavailability of the Entrapment Defense in New York City "Plain View" Marijuana Arrests*, 21 J.L. & Pol'y 189, 235–36 (2012) ("Furthermore, NYPD supervisors earn overtime pay when their subordinate officers do. This provides an incentive up and down the command structure to maximize opportunities for overtime and therefore to maximize arrests").  The jury may find Lieutenant Moran complicit with abuse of the city's overtime policy.

V. Conclusion

Summary judgment is granted to all defendants on all claims of stop and frisk.  Because Officers Essig and Rubin relied on Officer Hugasian's instruction and probable cause determination when they arrested Hector Cordero, summary judgment is granted in their favor for the claim of false arrest.

The following claims will be tried in phase I: (1) false arrest against Officer Hugasian; (2) malicious prosecution against Officer Hugasian; (3) denial of a right to a fair trial against Officer Hugasian; (4) unlawful strip search against Officer Rubin; (5) failure to intervene, by Officer Essig; and (6) supervisory liability against Lieutenant Moran.

In phase II *Monell* claims against the City of New York will be tried if any of the individual defendants are found liable as to any of the claims in phase I.

Trial for phase I shall commence on January 22, 2018 in Courtroom 10 B South.  A jury shall be selected that morning by the magistrate judge.  The parties shall be available in court beginning at 9 a.m.

A hearing on motions *in limine* and all other pre-trial issues shall be held on January 16, 2018, at 10:30 a.m. in Courtroom 10 B South.  Plaintiff and individual defendants shall be present with counsel.

The parties shall exchange and file with the court by January 9, 2018, the following: (1) motions *in limine*; (2) lists of pre-marked exhibits proposed for use at the trial, together with copies of the exhibits, and any stipulations regarding admissibility and authenticity; (3) lists of proposed witnesses together with brief summaries of their proposed testimony; and (4) stipulations with respect to undisputed facts.

The parties may submit motions challenging the court's decision to provide a bifurcated trial.

The parties shall agree on a briefing schedule.  If they cannot agree all scheduling issues are respectfully referred to the magistrate judge.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated:  October 17, 2017
        Brooklyn, New York

---

[1]   *See, e.g.,* Nathan Tempey, *Two NYPD Detectives Arrested For Allegedly Lying About A Gun Bust,* Feb. 17, 2017 ("Two Queens detectives have been arrested on official misconduct and filing a false instrument charges stemming from a 2014 gun possession arrest they made in Washington Heights, which

prosecutors say was based on an illegal search justified by repeated lies."); Robert Lewis, *The Hard Truth About Cops Who Lie*, WNYC News, Oct. 13, 2015 ("Last year, New York's Civilian Complaint Review Board flagged as many officers for making false statements as it had in the previous four years combined . . . A review of more than a thousand criminal and civil court cases, and interviews with dozens of attorneys, turned up more than 120 officers with at least one documented credibility issue over the past 10 years."); Thomas Tracy, *NYPD cop convicted for illegally cuffing man, lying to back up arrest,* NY Daily News, Mar. 10, 2017 ("A Manhattan jury convicted a city cop accused of unlawfully arresting a man, then making up a story to legitimize the arrest."); Joseph Goldstein, *Narcotics Detective Faces Perjury Charges*, N.Y. Times, June 16, 2011 (NYPD detective indicted after video surveillance showed he lied when he testified that "while sitting in his unmarked car, he saw a man selling crack cocaine along Bronx Boulevard"); Laura Dimon, *Two cops accused of fudging Washington Heights man's gun possession on search warrant, before grand jury*, NY Daily News, Feb. 17, 2017 ("Two NYPD detectives — including one decorated by former Mayor Michael Bloomberg — were arrested Thursday on accusations they fabricated seeing a man with a gun in Washington Heights and repeated the lie on a search warrant and before a grand jury."); Josh Saul, '*Lying' cop costs NYPD big-time bust*, New York Post, May 27, 2015 ("The ruling by federal Judge Paul Engelmayer — made after Rios even lied to him under oath about having previously lied — effectively kills the drug rap against Christian Gonzalez that carried up to 20 years in prison."); Anahad O'Connor, *Two Officers Are Accused of Lying About Searches*, N.Y. Times, Jul. 16, 2010 ("A New York City police sergeant lied to cover up several unlawful stops and seizures in Manhattan and forced subordinates to falsify paperwork to justify the stops, authorities said Thursday in announcing the indictment of two officers."); Russ Buettner, *Police Officer Guilty of Falsifying Information*, N.Y. Times, Mar. 8, 2012 ("A New York City police officer was convicted on Thursday of lying under oath and filing false information to obtain a search warrant, the second conviction in what prosecutors described as a scheme to cover up illegal searches of vehicles."); John Eligon, *Ex-Officer Convicted of Lying About Confrontation With Cyclist*, N.Y. Times, Apr. 29, 2010 ("A former police officer was convicted on Thursday of lying about a collision with a bicyclist who was taking part in a Critical Mass ride in Times Square in 2008 — an altercation that was videotaped and became a viral presence on the Internet."); J. David Goodman, *Review Board Notes Rise in New York Police Officers' False Statements*, N.Y. Times, May 14, 2015 ("Officers documented 7,283 searches after stops in 2014, according to Police Department data contained in the report. Of those, one in 12 resulted in a complaint to the review board, a frequency that has increased sharply over past two years. In many cases, Mr. Emery said, the problem could be resolved by requiring further training."); Michelle Alexander, *Why Police Lie Under Oath,* N.Y. Times, Feb. 2, 2017 ("The natural tendency to lie makes quota systems and financial incentives that reward the police for the sheer numbers of people stopped, frisked or arrested especially

dangerous. One lie can destroy a life, resulting in the loss of employment, a prison term and relegation to permanent second-class status.").

 [2] *See, e.g.,* Sarah Ryley, *NYPD's most-sued cop also among top overtime earners for past two years*, N.Y. Daily News, Feb. 17, 2014 ("Most-Sued") ("Nine" of the twelve most sued officers in the city "are also above the 85th percentile of overtime earners out of the department's 35,000 plus officers . . . the vast majority of lawsuits . . . are for bogus arrests."); Ginia Bellafante, *Culture of Concealment Protects Police Officers*, N.Y. Times, April 8, 2016 ("A lot of overtime can indicate either a penchant for hard work, or a propensity for making unnecessary arrests, with the notion that the attendant paperwork will extend the clock."); John Annese, *Exclusive: NYPD cops indicted for lying in gun case may get more charges after man sues over Queens drug arrest*, NY Daily News, Feb. 18, 2017 (cops indicted over false drug and gun arrests were paid "$33,144" and "$29,954 in overtime" in 2016); Susan Edelman, *Here's How the City Distributed $1.9B in Overtime Pay,* NY Post, Aug. 5, 2017; IBO Report 2015 (reporting the NYPD spent $767 on overtime in the 2017 fiscal year, and "[s]pending on overtime from 1996 through 2014 increased at an average rate of about 9 percent a year."); Erin Durkin, *NYPD's top overtime earner raked in $82G of extra pay in past year: city records,* New York Daily News, Oct. 1, 2014 ("NYPD's top overtime earner is a sergeant in the detective bureau who pulled in $82,115 in extra pay last year, city records show."); New York City Independent Budget Office, *Focus On: The Executive Budget*, May 2015, ("IBO Report 2015") ("Uniformed NYPD overtime is a major component of police spending, averaging about 18 percent of base pay over the period from 2009 through 2014."); Christopher Robbins, *The NYPD's most sued Cop is Also Addicted to Overtime*, Gothamist, Feb. 17, 2014 ("Through his spokesman, Commissioner Bratton told the News that he was conducting a wide-ranging review of the department . . . 'and part of that review has to be overtime.'"); Nathan Tempey, *Cop's Instagram Reveals Passion for Arresting Activists, Overtime*, Gothamist, Jan. 12, 2016 (Queens officer posted a picture of himself in a shirt that reads "I Handcuff Protesters (with "OT" bolded, for overtime); John Annese, *Staten Island cop accused of writing bogus traffic tickets to pad overtime*, silive.com, Jul. 20, 2011; Ari Rosmarin, *The Phantom Defense: The Unavailability of the Entrapment Defense in New York City "Plain View" Marijuana Arrests*, 21 J.L. & Pol'y 189, 235–36 (2012) ("While overtime pay is a well-documented motivating factor in police work, narcotics officers have received more opportunities for overtime than other officers . . . Under NYPD overtime policies, officers that make arrests near the end of their shift are eligible for hours of overtime pay--at time and a half--for the booking process."); William K. Rashbaum, *8 Officers Charged With Gun Trafficking in U.S. Corruption Case*, N.Y. Times, Oct. 25, 2011 ("In recent weeks, testimony at the trial of narcotics detective has featured accusations that he and his colleagues in Brooklyn and Queens planted drugs or lied under oath to meet arrest quotas and earn overtime, leading to the arrests of eight officers."); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 599

(S.D.N.Y. 2013) ("Officer Polanco interpreting Officer Herran as encouraging officers to carry out an arrest on Friday night so that the City will have to pay overtime the following day.").  False arrests for overtime pay is routinely probed in New York state criminal cases.  *People v. Johnson*, 225 A.D.2d 464 (1996) ("In this closely contested "buy and bust" case, it was the defense theory that the arresting officers fabricated their account of a drug sale in order to justify numerous hours of overtime processing the defendant's arrest."); *People v. Enoe*, 144 A.D.3d 1052, 1053 (N.Y. App. Div. 2016) ("[T]he People sought to limit the defense's questioning of one of the prosecution witnesses, Sergeant Gaspari, with respect to a federal civil rights lawsuit that had been filed against him" claiming he  "had falsely arrested him on a made-up weapon possession charge in order to secure overtime compensation."); *People v. Padilla*, 901 N.Y.S.2d 909 (Sup. Ct. 2009) ("During his initial hearing testimony, however, he indicated that he and Officer Cercel did not take the arrest on that evening because they would not earn cash overtime.").  There is evidence that this practice is ubiquitous across jurisdictions.  Mark Iris, Ph.D., *Illegal Searches in Chicago: The Outcomes of 42 U.S.C. S 1983 Litigation*, 32 St. Louis U. Pub. L. Rev. 123, 126–27 (2012) (discussing police "falsely arresting people for driving under the influence ("DUI") in order to generate additional overtime for the numerous court appearances associated with these cases."); Rachel A. Harmon, *Why Arrest*?, 115 Mich. L. Rev. 307, 353 (2016) (finding that officers on patrol are often given great discretion "which can lead to arrests for reasons unrelated to the public interest, such as the suspect's demeanor towards the officer, or whether the officer wants overtime pay."); Wayne A. Logan, *After the Cheering Stopped: Decriminalization and Legalism's Limits,* 24 Cornell J.L. & Pub. Pol'y 319, 332 (2014) ("For officers, the arrests, especially when triggering overtime pay, amount to "collars for dollars.").